^THOMPSON, J.
This is an important case, as well on account of the pecuniary interests at stake as of the novel and interesting legal questions involved in its decisionand it has been argued with a zeal and ability, on the part of counsel, worthy of its importance. These considerations have successfully invoked for it the most mature consideration of the court; and if, enlightened as our deliberations have been by the discussions of the bar, we have failed to arrive at correct conclusions, the failure is the natural and inevitable result of the diversity of human opinion and the fallability and infirmity of human judgment.
Decide this case as we may, our judgment will be productive of hardship to the losing part3: to the bank who committed their funds to the custody and safe-keeping of their cashier, upon the guaranty of his securities, who had become, as was believed, sponsors for his capacity, integrity, diligence and fidelity to his trust; to Durkin, the cashier, since the jury have acquitted him of intentional wrong or moral turpitude, have exonerated his character from suspicion or reproach, and have found that the loss in this case resulted from negligence and over-confidence in others; and to his sureties, in being visited with so heavy a responsibility for such a delinquency. But these considerations are wholly irrelevant, and ought and can have no bearing or influence upon the decision of the questions involved. It has been well remarked, by a great judge, that “hard cases are the quicksands of the law, ” and he might have added, that in the vain and abortive attempt to bend and accommodate the law to meet the exigencies of special and particular cases of hardship, we encounter the hazard of subverting all law.
Upon the question of hardship to the securities, too, it is not unworthy of remark, that should they escape responsibility for the acts and delinquencies of Durkin, it will not be because thej' did not intend to bind themselves; for it is conceded that they so intended, and *that all parties believed they had so bound themselves; (and to withhold that concession and affirm the contrary now, would be to lay the foundation for an imputation of bad faith to the securities, especially those of them who were members of the Board of Directors), but because of the failure or omission on the part of the Directors to do and perform those merely formal acts now alleged to be requisite by the condition of the bond to charge them, oí which constituted a condition precedent to the accrual of their liability.
*753 Seven errors are assigned to the judgment under review, founded upon exceptions taken to the rulings of the court, below: .
“1. Dor over-ruling the demurrer to the whole declaration, which alleged generally, that the defendant Durkin did not well, &c. perform ‘the duties of said office of cashier,’ without saying, ‘which were prescribed by the Board of Directors,’ although the defendants were liable for the performance of such duties only as may be so prescribed.”
“2. Dor over-ruling the demurrer to the second breach assigned, which alleged that the duty set forth in the breach was prescribed by the Board of Directors, but did not set forth in what manner it was prescribed, so as to enable the court to see that it had been properly done. The manner in which the duties were to be prescribed was a question of law, and the rule is, that ‘where a man owns that he has done a thing which involves in it a question of law, whether it is done as the law directs, the quo modo must be averred.’ Wright v. Tutter, 4 Day, 322; Thomas v. Van Ness, 4 Wend. 553; Chitty Pl. 357.”
“3. Por over-ruling the demurrer to the fourth breach assigned, which did not aver directly that the duty had been prescribed by the Board of Directors. The averment is, that money came into the hands of Durkin ‘by authority and prescription of the said Board of Directors, to be by him kept,’ &c. If this can be regarded in any sense as alleging that the *Board prescribed that it should be the duty of Durkin to keep the money, (as it hardly can be,) it is at best only indirect and argumentative, and bad on general demurrer. Dickinson v. McCraw, 4 Rand. 158. And the second and fourth breaches were both further defective in not alleging that Durkin had notice of the duties prescribed to him by the Board.”
■‘4. Por rejecting the pleas tendered to the 2d and 4th breaches, which averred that duties were not prescribed by any order, resolution, or vote of the Board, and in rejecting the pleas Q and E, tendered to the same breach, when the case was called for trial. The two last involved the proposition, that the defendants were not liable on the bond, until the duties of the cashier had been prescribed; the others involved the proposition, that the defendants were not liable for the performance of the particular duty set forth in the breaches respectively, unless it was prescribed by some order, resolution or vote of the Board.”
“5. Por refusing to give the instructions asked by the counsel for the defendants, and giving others inconsistent therewith.
‘ ‘The instructions moved by the defendants declared that, although the directors of the bank and the cashier himself were of opinion that the safe keeping of the money of the bank was a duty devolved upon the cashier and properly appertained to his office, by law or usage, or otherwise, and that his securities were legally bound for the fulfillment of the same, yet if, in point of fact, that duty was not prescribed to the cashier by the Board of Directors, after the execution of the bond and before the happening of the default, the defendants were not liable. And that such duty must have been prescribed by the Board by some resolution or order, appropriate to evince their sense in that behalf, with the intention thereby to ascertain and declare the duty of the cashier in and about the money of the bank.
“The instruction given by the court upon the subject of prescribing the duties of cashier was ambiguous, and “'led to conflicting views oí its meaning on the part of the opposing counsel. The counsel for the defendants insisted that the instruction imported, that the Board of Directors had taken up the subject of the cashier’s duties for consideration, and come to a conclusion in relation thereto, which ascertained and expressed the sense of the Board for the time being, touching the duty of the officer; but the court stopped the counsel, and instructed the jury that such was not the true import of the previous instruction. The court then proceeded to explain its meaning to be, that ‘no particular mode of proceeding was necessary to be observed by the Board in their action upon the subject ; but that it was necessary for the said Board of Directors, acting as a Board, to indicate their will in some distinct and intelligible mode, that it should be the duty of the cashier, Durkin, to take charge of, and faithfully keep and account for, and pay off when required,’ &c. ‘the money,’ &c. and that their will in relation thereto must be made known to him; but ‘that this prescription of his duty, or declaration of their will in relation thereto, and a knowledge of it by said Durkin, maj’ be inferred by the jury from facts and circumstances, which will satisfy their minds’ of the facts.
“Now the ‘will’ of the Board that Dur-kin should keep and account for the money, was ‘indicated’ by their permitting him to have charge of the vault and its contents, by their appointing him to the office of cashier and continuing him in it, by their requiring the money in his possession to be counted, and various other acts; and the import of the instruction is, that by such acts as these the Board prescribed the duty of the cashier to keep the money. Yet all these, and like acts and circumstances, only go to show that the money of the Bank was. in possession of Durkin by the permission and with the knowledge of the Board, and that they regarded him as liable for the safe-keeping of it, as he certainly was, independently of his bond; but they do not show, and cannot show, that the Board had prescribed *'that it should be his duty to keep the money. The instruction declares that it is not necessary that there should have been any distinct, direct, specific action of the Board on the subject of the cashier’s duty, and implies that it is enough, if he was allowed to perform certain acts with the knowledge and by the authority of the Board.
‘ ‘The error of the court, and it is an. *754 ■error which pervades the whole proceeding', is this, that no distinction is made between the duties resulting from the position of the cashier, or assumed by him, and the duties prescribed to him. Yet the distinction is very broad. And the additional error is this,'which the court does not seem to have perceived, that an aggregate corporation acts only, and can act only, so far as its acts may concern the sureties of its own agents, by.its corporate will duly expressed. In respect to third persons, the corporation may be, and under many circumstances is, precluded from denying the authority of its agents, though that authority resulted from no formal grant whatever; but where, as in this case, the corporation seeks tq assert against others, as sureties, a liability founded upon some formal act of its own, there the formal act is a condition precedent, and must distinctly be shown to have been performed.
“The express language of the bond excludes from the undertaking of the sureties the duties incident to the office of cashier, and annexed to it by law, if such there be, as it does with equal clearness the duties which have been imposed upon the cashier by the Board, or other authority, prior to the date of' the bond. It was for such duties as the Board .thereafter prescribed that the sureties undertook, provided they were prescribed in the formal and orderly manner required both'by the charter and by-laws of the corporation. It cannot be questioned that .the charter made it 'the duty of the Board to ascertain and mark out the duties of the officers, the cashier inclusive; and that the 11th section of the by-laws super-added the sanction of the stockholders to the requirements *of the statute. The bond would have been appropriate had the Board performed its duty; but it cannot bé made to support a claim for a loss resulting from the neglect of no duty, which the Board had marked out and required of the officer. The safety of the bank, justice to the sureties, consideration for the cashier, respect for the law, all required that the Board should have duly considered the subject of the cashier’s duties, have come to a decision in respect thereto, and caused it to be recorded in their minute's. This duty of theirs was wholly neglected, and its performance was esse'ntial'td any claim upon the sureties. It was not for the defendants to show, that the loss would not have occurred if the Directors had used ordinary diligence 'in performing their duties; but nothing is'truer, than that an officer may be betrayed by the neglect o'f those to whom he is accountable, to define his duties and his powers'. Mr. Durkin, innocent as he .'is admitted to be, in fact, would doubtless have faithfully' observed -any orders of the Board,”
“6. Tor overruling the defendant’s motion for a new trial. There was no proof that the Board of Directors had eve'r acted upon or considered the subject of the cashier’s duty. The journal of their proceedings, which was complete, (and is part of the record,) was silent upon the subject, the only proof on the subject of the duty of the cashier was in substance that he held the office, had charge of the vault and cash of the bank, and performed other duties commonly belonging to the office of cashier, with the knowledge and acquiescence of the Board; that the Board had appointed committees quarterly for the purpose of counting the money of the bank, to whom the cashier had produced the money in his possession to be counted by them, and by whom the money, after being so counted, was restored to his possession, and that such committees had made reports to the Board, which were recorded on the journal of their proceedings.
“Your petitioners are advised, that the evidence before *the jury did not show, nor authorize the jury to infer, that the Board of Directors had prescribed the duty to the cashier to keep the money of the bank, as contemplated by the charter and by-laws of the bank and by the cashier’s bond. And they are further advised, that as +he charter requires that the Board shall keep a journal,-in which ‘all their proceedings shall be entered and faithfully recorded,’ the bank claiming against third persons the benefit of an act alleged to have been done by the Board, ought to have been required to establish the performance of such act by the evidence- which the charter requires to be taken and preserved of all such acts, unless it could be shown that the record was lost or destroyed, or that the proceeding of the Board was prevented by fraud or accident from being recorded.”
“7. Tor admitting evidence of the teller, as to his having been called on and required by committees of the Board of Directors, (the same who counted the cash in Durkin’s possession,) to produce the cash in his possession to be counted, which was not relevant to any issue in the cause.”
It will be unnecessary to consider these seven assignments -of error seriatim, because the decision of the Sth involves the decision of the 1st, 2d, 3d, and 4th, and I may say the 6th. As to the 7th,,it hardly deserves a passing notice.
If the exposition of the law propounded by the court to the jury, in the instruction and explanatory instruction which it gave upon the issues joined, were right and proper, then it follows, as a corollary, that it properly refused the instruction asked by the defendant’s counsel; properly overruled the demurrer to the whole declaration and to the 2d and 4th breaches assigned ; properly rejected the pleas first tendered to the 2d and 4th breaches assigned, and the pleas Q and R, tendered to the same breaches, when the cause was called for trial, and, I will add, properly overruled the motion for a new trial.
*The ruling of the court upon the demurrer, upon the reception and rejection of the pleas offered, the issues joined, the instructions refused and those given, and the overruling of the motion for a new trial, all proceeded upon the assumption or concession that the condition of the *755 bond provided for and required a prospective or future prescription of duty by the Board of Directors, and that until the duty was prescribed, after the execution of the bond, and notice thereof given to the cashier before the default, the liability of the securities did not arise or" accrue. Whether this was the proper construction of the bond, I shall say more in the sequel. Tor the present, conceding it to be the true construction, I will proceed to consider the material questions arising upon the record, based upon that construction, having reference to the quo modo, or form of the prescription, and the kind of proof by which it may be established.
It was insisted, in the defence in the court below, that the securities were liable for the breach of such duties, and such duties only, as should have been prescribed after the date of the bond, and notice thereof to the cashier before the default, and that the condition of the bond covered no duties theretofore existing, whether in virtue of common, statute, by-law, order, resolution, or vote, or whether incident, ex vi termini, to the relation of cashier, or inherent in and inseparable from the office. This was conceded by the court. It was further insisted, that the future or prospective duties, for the breach of which the sureties were responsible, must have been prescribed in the form of a by-law, resolution, order, or vote of the Directors; that the term prescribed; ex vi termini, raised an irresistible implication, that the prescription of duty must be in writing, ánd spread upon the journal of the Board; and that it could only be proved by the production of the journals, or upon proof of their loss or destruction, by secondary evidence of their contents; or proof that such order, resolution, or vote was made, adopted, or taken, and intended to be spread upon the journals, but was not ^recorded, in consequence of fraud, accident, inadvertence, or mistake; and they prayed the court so to instruct the jury. The court refused to give the instruction, and gave its own instruction and explanatory instruction, in reference both to the form of the prescription and the mode of proof. It first instructed the jury: “That it is incumbent upon the plaintiff to support the issues made by the 1st, 2d, and 3d pleas to the 2d and 4th breaches in the declaration alleged, to prove, that after the election and appointment of the said Patrick Durkin as cashier of the office of discount and deposit of the Exchange Bank of Virginia, at Petersburg, and the acceptance of said office by him, and the execution and delivery of the writing obligatory, in the declaration mentioned, to wit, on the 20th May, 1842, the Directors of said office of discount and deposit did prescribe that it should be the duty of said Patrick Durkin, as cashier aforesaid, to take charge of and faithfully keep and account for, and pay over, when required by said Board, all the moneys, coins and notes belonging to said office of discount and deposit of the Exchange Bank of Virginia, at Petersburg, and that the said Durkin had notice of said prescription before the happening of said loss in the said breaches mentioned. But that it is not necessary, in order to prove the prescription of said duty, that a formal order or vote of said Board should be entered on the journals of said Board, or exhibited in evidence, but that such prescription of duty bj the said Board, and a knowledge of the same by the said Durkin, may be inferred by the jury, from facts and circumstances which will satisfy their minds that such prescription was made, and that Patrick Durkin knew of the same before the happening of the loss in said breaches alleged;” and then, by way of explanation, told the jury that it intended by its instruction to declare, “that no particular mode of proceeding was necessary to be observed by the Board in their action upon the subject; but that it was necessary for the Board of Directors, acting as a Board, to indicate *their will in some distinct and intelligible mode, that it should be the duty of Durkin to take charge of and faithfully keep and account for and pay over, when required by the said Board, all the money, coins and notes belonging to said office of discount and deposit, and that their will in relation thereto must be made known to the said Durkin as cashier aforesaid. That this prescription of his duty, or declaration of their will in relation thereto, and a knowledge of it by the said Durkin, may be inferred by the jury, from facts and circumstances which will satisfy their minds, that such prescription of duty was made, and that Patrick Durkin knew of the same before the happening of the loss in the said breach alleged.”
Upon this exposition of the law, the jury found for the plaintiff; and I do not perceive upon what ground the court below, or this court, can question the rectitude of that finding upon the law, as expounded by the court and the facts given in evidence. The only question, as it seems to me, is, as to the legality or rectitude of the instructions. The counsel of the appellants have insisted in argument here, that as the charter of the bank dated 2£>th May, 1837, which quo ad hoc was the general bank law passed the 12th March, 1837, required that the duties of its officers should be “marked out or prescribed,” as the by-laws of the mother bank required the same; and provided, “that the directors of the offices of discount and deposit should appoint their respective officers, whose duties, not otherwise provided for, should be prescribed by the respective directories of said offices,” and that as the 6th section of the general bank law also provides, 1 ‘that the President and Directors shall keep a book, in which shall be entered and faithfully recorded a journal of all their proceedings,” nothing short of a written prescription, in the form of a by-law, order, resolution, or vote, entered and faithfully recorded on the journal of their proceedings, could satisfy the requirements of the condition of the *756 bond; and that such written prescription could only be established *by the production of the journals, unless proof was given of their loss or destruction, or that such order, resolution, or vole, made by a legal Board, and intended to be recorded, was not so recorded, in consequence of inadvertence, accident, fraud, or mistake. They contended, that the provisions of the charter were-mandatory and imperative, and not merely' directory; but that, even if directory,' the bond having been framed with a view to the terms of the direction, it had precisely the same force and effect in the construction of the liabilities imposed by the condition of the bond, as if the charter and by-laws, made in pursuance thereof, were mandatory and imperative. They insisted, that the contract of guaranty is strictissimi juris, and that the guarantors or securities had a right to stand upon the terms of their guaranty or contract of securityship; and that in this case, whilst in the pleas received and first member of its instructions, the court seemed to concede to them that right, yet the subsequent part of the instructions, and the court’s explanation of it, rendered the whole instruction together liable to the objection of keeping the word of promise to the sense and breaking it to the hopes; because they said the instruction, as to the form of the prescription, and the kind of proof by which it might be established, rendered the first part of the instruction nugatory and of no practical value, and left the jury at liberty to presume, from vague circumstantial evidence, consisting of Dur-kin’s appointment, acceptance of the office, and execution of the bond, his acting as cashier, and accounting quarterly with the committee of the bank, whose reports were spread upon the journals, a prescription of some kind, not in the form of an order, resolution, or vote, (because the journals negatived that presumption,) but in the form of an intelligible expression of the collective will of the Board; that Durkin should perform the duty in question, and that Durkin had notice of that will. At the first blush, I confess, it appeared to me that one member of the instruction was in conflict with ‘>:'and evasive of the other, and that one or the other must be erroneous; and I think now the proposition of law, intended to be laid down by the court, might have been so framed-that, whilst it conveyed in substance and result the same legal proposition, it would have been less liable to cavil or criticism; all the court meant to say was, that the jury, from facts and circumstances, from circumstantial evidence, might presume a valid legal prescription, within the contemplation of the condition of the bond, that such prescription need not be by order, resolution, or vote, recorded on the journals; but might be oral, if it expresséd the collective' will of a regular Board'; or that a tacit expression of the will of the Board, and notice of it to Durkin, might be presumed from the act of the Board, and of Durkin after his new appointment, and up to the period of the default, coupled with similar acts, and similar duties performed, from 1838 to-1842, under his first appointment.
By the narrow and technical rules of the common law, applicable to the acts and contracts of corporations, it may be very true that the instructions of the court upon, the issues joined, upon its construction of the force and effect of the condition of the bond, could not have been sustained. By the common law, a corporation could only speak and act by its common seal, (figuratively called its hand and mouth,) and its. deed. It was not subject to the presumptions applicable to natural persons. It was not bound by, nor could it bind others, by implied contracts. The inconvenience of such principles were the less felt because of the paucity and the character of corporations principally, if not exclusively, known to the common law at the time of their adoption : They were political, municipal, and religious. The joint-stock, and other corporations of that character, which are little else than legal partnerships or private associations endowed with some of the attributes of the old corporations, are comparatively of modern invention; and so-rapidly have they multiplied, and so diverse their objects, extending to almost every ^object of human pursuit, that the necessity of departing from the narrow rules of the common law, and of adopting others better suited to the exigencies of modern society, could not long be resisted. Accordingly, we find that, by the force of judicial decision and legislative enactment, the ancient law of corporations, as well in England as in America, but more especially in the United States, has been well nigh abrogated, and a new law substituted, resembling each other perhaps less than the feudal system resembles the present English tenures or the land tenures in the United States. The seal, though nominally retained, has been practically dispensed with. The by-law, order, resolution, or vote, has superseded it; and many of the heavy liabilities due from or to corporations are based upon contracts authenticated by neither seal, order, resolution, or vote, but upon contracts implied by law.
The law of corporations has been examined and discussed with such consummate ability, and the modern doctrines so clearly deduced, in the able opinions delivered in the three leading American cases of Union Bank of Maryland v. Ridgely, 1 H. & Gill, 324, U. S. Bank v. Dandridge, 12 Wheaton, 64, and Bank of Alexandria v. Minor, 1 Peters, 72, and the doctrine of these cases as well as others, late and early, English and American, so well collated and digested by Angell & Ames, in their admirable Treatise on Corporations, in sections 173, 2S2, 238, 241, 284, 239, 240, 83, 284, 328, 332, 2S7, 267 and 346, as to render any other reference to or citation of authorities unnecessary, in the presentation of the view I have taken of this case.
*757 These authorities establish: That the rules of presumptive evidence apply to corporations as well as to individuals or natural persons; that persons acting publicly as officers of the corporation are presumed rightfully in office.
The previous necessary steps are presumed in order to make a corporate act legally operative.
Grants and proceedings beneficial to the corporation *are presumed to have been accepted by it, especially when the presumption is fortified even by slight acts indicating an intention to accept.
A general agent of the corporation may prove his authority by corporate acts contemplating or recognizing it.
A charter may be presumed from the long exercise of corporate rights, or the acceptance of a new charter from the acts of the corporate officers, or a demise from year to year to or from the corporation. So the adoption or repeal of a body of bylaws ; so the extent of their possession drawn in question by an ejectment; so a surrender of their corporate rights, or a contract or promise by the corporation, or a regular vote of the corporate body.
The cases cited, and the citations from Angelí & Ames, are not only authority for the foregoing series of legal propositions, but the case of U. S. Bank v. Dandridge is express authority for our holding the provisions of this charter to be directory, and not mandatory or imperative. The former Special Court of Appeals, in 1851, decided in the same way in the case of Carter v. Bank of Virginia, (not reported,) wherein they held a bond given in the sum of $6,000 to be good and binding upon the securities, although the by-law of the bank required a bond in the penalty of $3,000 onl3.
There is nothing in the term prescribe, indicative of a written rather than an oral prescription. The words mark out, or assign, would have conveyed the same meaning; and one of the words no more imported a written prescription than the other.
If, then, the prescription of duty need not necessarily be in writing, in the form of an order, resolution or vote, spread on the journal, nor in any other particular form, as the court ruled, and I think rightly ruled, the only desideratum being the expression of the collective will of the Board in one intelligible form or another, I see no sub-! stantial objection to the instruction *of the court, neither as to the form of the prescription nor as to the mode of proof, nor to the finding of the jury upon the evidence adduced. It seems to me that both the instructions and the verdict are fullj’ sustained by the principles of the cases I have cited. Indeed, I feel very strong doubt whether the court did not stop short of , its duty to the plaintiff in not going further ; and instructing the jury that the defendants i were precluded, by an estoppel in pais, | from gainsa3*ing the prescription upon the ' facts disclosed by the evidence in this cause. ! Unquestionably Durkin was, and I think ’ there is as little doubt but that those of the obligors who were Directors were. As to them, at least, it would seem to me the presumption was conclusive that Durkin became possessed of the funds rightfully and in pursuance of a prescription or rule of the Board, rather than as a tort feasor or spoliator; and if Durkin would have been estopped, and could not prevent a recovery upon the bond against him, wh3 should not the securities be also, even though they had occupied a different position, and one from which no inference or presumption of standing by and acquiescing could have been drawn against them, as in this case? Why should the jury not have been authorized by the instructions to presume, from facts which were made matters of record every quarter, to wit: the quarterly reports of committees of examination, establishing that the cashier had charge of the funds of the bank and held them subject to be disbursed and accounted for under the orders of the Board, to have presumed that which this state of facts pre-supposed, to wit: a prescription, and to presume it to have existed in that form, whether in writing or by parol, sufficient to bind, and, if need be, to presume it as a tacit implication, arising as well from the past as the present relations and acts of the parties.
Any English lexicon will inform us, that a cashier is one who has charge of money, or superintends the books, payments and receipts of a bank or moneyed institution. The general bank law or charter requires *the appointment of this officer, and if not expressly, by inevitable implication, from the quarterly examination which it directs into his receipts, diburse-ments and cash on hand, recognizes it to be the duty, the primary and fundamental dut3T — -the duty incident to the office ex vi termini, inherent in and inseparable from it — and I will add, a dut3T established by the universal usage of banks — to receive the money of the bank, take care of it, disburse it under the orders of the Board, and render an account and pay over when required by his superiors.
Durkin was first appointed cashier in 1838, when the branch at -Petersburg was established. It is an office held at the pleasure of the Board. Between 1838 and 1842, the date of this bond, he gave one, certainly, if not two, official bonds, in one of which some of the obligors in this bond were bound as securities — the terms of the condition were the same — and during the whole period, from 1838 to 1842, - and from 1842 to the discovery of the default, and his consequent removal, he regularly accounted, according to law, with committees of the bank every quarter, and their report appears upon the journal, showing that he accounted for, and paid and received back in return, the cash on hand. Do not all these facts and circumstances go very strongly, if not conclusively, to show, that all parties believed and understood that no formal subsequent prescription was necessary to cover these duties, and that it was *758 insisted abundanti cautila to empower the branch Directory to superadd additional extra duties, if they should find it necessary, such as devolving on the cashier the regular and proper duties of teller, bookkeeper, &c.? And, in truth, according to my understanding of the charter and bylaws, that was the only legitimate purpose of such a provision; for it was the duty of the Board of the mother bank to prescribe the general duties of its officers, and the province of the branch Board to prescribe duties not otherwise provided for, or prescribed by the mother Board, and the power given to *the branch Board seems to have been intended to meet such a case as just supposed, and others in pari ratione that might be imagined.
If, then, the court had instructed the jury that the appointment of Durkin as cashier of the bank by the Board of Directors, to receive the money of the bank, take care of it, and disburse it under the orders of the Board, and account for and pay it over according to law- — the acceptance of the appointment by Durkin, with a knowledge of the purposes for which he was appointed, his giving the bond with securities, and his receiving the money of the bank as cashier in the absence of any b3'-law of the bank, or any resolution, order or other vote of the Directors, or any other formal and. specific prescription, oral or written, by which the duties of the cashier might have been prescribed — is a sufficient prescription of his duty by the Board to render both Durkin and his securities responsible to the bank for the amount of money so received by him, and which may have been lost by his negligence, I incline to think it would llave been proper, even under the issues joined: because of the doctrine of estoppel in pais, which should have precluded the parties from gainsaying the prescription. Upon my construction of the bond, which I shall come to presently, there would have been no doubt of the legality and propriety of such an instruction.
Having arrived at the conclusion, that there was no error in the instructions, as the case stood when they were given, it follows that there was no error in the rulings upon the pleadings, and the motion for a new trial, set forth and complained of in the 1st, 2d, 3d, 4th and 6th assignments of error.
As to the 7th, as the counsel on neither side argued it, and the appellants’ counsel seemed to abandon it, by passing it over almost sub silentio, I shall be excused for disposing of it very summarily. The exception was for the admission of evidence. No other objection can be assigned to it, than that it appears to me to be irrelevant and immaterial; and whilst it could not have benefited *the plaintiff, being merely irrelevant and immaterial, it could by no possibility prejudice the defendants, and is, therefore, no ground of error.
I come now to consider, as briefly as may be, and to express my opinion upon the reserved question, as to the true construction of the condition of the bond, and to show the effects and consequences resulting from that construction upon the pleadings, issues and instructions of the court below. It may seem to be a work of supererogation, since the case has been decided against the defendants upon the issues joined upon the construction adopted by that court, and although false and immaterial issues upon mine, yet obligatory upon the defendants, as they cannot complain of a verdict and judgment against them rendered upon false or immaterial issues of their own tendering; whilst, on the other hand, had the ■verdict and judgment been against the plaintiff, he might have reversed it, because of the immateriality of the issues, and would have been entitled to the award of a re-pleader. The reason why I desire to express my opinion upon this question is, because I take it for granted, if I can succeed in showing that, upon the true construction of this bond and upon the proper issue that should have been joined, and the proper instructions that should have been given, the plaintiff was clearly entitled to a verdict and judgment, (whatever doubts may remain upon the decision of the case as it was presented,) it will be gratifying to the defendants themselves to know that the case was against them upon other grounds, and that they have not, therefore, been injured by making immaterial issues, and by erroneous instructions under those issues.
So far from concurring with the court below in the literal construction which it gave to the condition of the bond, whereby it made it extend to and cover only such duties as might be prescribed after its execution, and before the default, my opinion is, that it extended to all duties theretofore prescribed, as well as those thereafter to be prescribed — that it was intended to be more comprehensive *even than a bond conditioned for good behavior or for the performance of the duties of the office, without more saying; either of which conditions, the counsel admit, would have been all-sufficient to bind and charge the securities, without any prospective or future prescription of duty. It is said, the defendants were entitled to the limited literal construction upon the maxims expressio unius exclusio alterius, and expressum facit cessare taciturn, and to the application of the rule of strictissimi juris, applied in the case of Campbell v. French, 6 Term Rep. 200. But there is another maxim of the law, qui haeret in litera, haeret in cor-tice, which requires us to carry out the intention of the parties against the strict letter, even though securities be concerned. As to the case of Campbell v. French, cited from 6 Term Rep. 200, which was a decision in error to the Common Pleas, where the case arose, was decided, and is reported in 2 H. B. 163, in the name of French v. Campbell—a case in which the decisions of the two courts were diametrically opposite— the Common Pleas holding the guarantor *759 or security bound, and the King’s Bench not — I am not prepared to say that the Court of King’s Bench gave a construction either too literal or strict in favor of the security. It may be, as the guarantor had stipulated for a protest for non-payment in India, he was entitled to have it, although the drawee in India had left before the arrival of the bill, and it was protested for non-acceptance by his agent, and was returned to London where the drawee was, and was there protested for non-payment. The Common Pleas held this protest as effectual to charge the guarantor, as if it had been made in India. The Court of King’s Bench held otherwise. Concede that to be the correct decision, the case cannot be made to bear upon this, without a petitio principii, or begging of the question — and that question is, did the parties intend by the bond to ignore all other duties, and to limit their liability for the performance of such duties, and such duties only, as should be prescribed subsequent to the date of the *bond and before the default? Is that the plain, necessary and inevitable construction of the words used, and are they susceptible of no other? If this bond had been conditioned for the performance of such duties as shall thereafter be prescribed by the Board, it would have been a much stronger case in favor of the strict, literal and limited construction. But it is conditioned for the performance of the duties of the office, and the words added “which may be prescribed,” which are to have the effect of ignoring and excluding all other duties but those thereafter to be prescribed, seem to me to be introduced parenthetically, and to have been intended only to empower the Board at Petersburg to add new duties not provided for otherwise — that is, by the charter, bylaws and orders or resolutions of the mother Board, or to guard against a possible difficulty that might have been anticipated, upon a bond conditioned for good behavior, or the performance of the duties of the office in the event of the prescription of new duties, they erroneously supposing that such bond would not cover or extend to new duties. The word may has in deeds and statutes a variety of meanings. In a statute, it sometimes means must or shall, sometimes may — and on one occasion, we are informed, it was held by a governor of Pennsylvania to - mean shan’t; but I do not cite this executive dictum as authority. In deeds, it may sometimes refer to the future only, and sometimes to past, present and future. I think the condition of this bond means the same thing as if it had said, “if the said Patrick Durkin shall well and ■truly and faithfully perform the duties of the said office of cashier, which have been, are now, or may be prescribed by the Board of Directors.” Am I not authorized so to read the bond, when it is manifest that all parties so understood and intended it, and when to read and give it a literal interpretation, confining it to duties thereafter to be prescribed, would make the whole proceeding of taking such a bond worse than an absurdity? Durkin had been in office since 1838, four 37ears before the execution *of this bond, had given one, if not two bonds before the present, with the same condition, as we have every right to suppose from the journals of the bank. The object of the new bond and new appointment was to better the security of the bank; the new bond, from the date of its execution, discharged the old; the new bond found him in the execution of the duties of cashier, which he had been performing for the preceding four years, and found him in possession of the treasure of the bank; and yet the directors are to be interpreted as having taken a bond of that cashier, which discharged his old bond, and gave the bank no security until a subsequent re-prescription of the whole duties of cashier. There was an interregnum in the securities furnished by the official bonds, during which, if Durkin had embezzled the money in his possession, there was no security bound. Isn’t it absurd to suppose, that upon the appointment of every new cashier, or the execution of any new bond by the old cashier, there should be required a re-prescription of all the duties of the office? And if this bond contemplated such a re-prescription, and furnished no security to the bank for the breach of any duty until the duty was subsequently prescribed, who was to make the prescription, the directory of the mother bank or of the branch? Now, we know that the general duties of the officers are to be prescribed by the Board of the mother bank, and the directory of the branches are to prescribe their duties not otherwise provided for. Were the two directors each to prescribe so much of the duty as came under the .scope of their respective powers? or was one Board to prescribe, the whole, and was it the province of the branch Board to make the prescription under the power of prescribing duties “not otherwise provided for,” since, according to the literal and ordinarily prospective operation given to the condition, no duty was provided for until afterwards re-enacted or prescribed?
It is argued, that if it be conceded that Durkin and his securities intended to bind themselves to the extent *1 have supposed and believed that they had so bound themselves, 3et if by mistake a bond was framed inadequate in its terms and provisions so to bind them, it is not competent for a court of law to correct the mistake by construction, even as to Durkin, nor of a court of equity as to the securities. That is verytrue, and the concession brings us back to the question, whether, according to an3 fair rule of construction, justified by reason', precedent and authority, I am sustained in the apparent freedom and latitude of construction which I have given to the instrument. It is certainly true, that both contracts, whether by specialty or parol, and statutes, are to be read and interpreted by the lights of surrounding circumstances, and that both in *760 statutes' and deeds "words may sometimes be transposed, sometimes omitted, sometimes added, and sometimes invested with a meaning" wholly the reverse of their true meaning and ordinary acceptation, in order to give a sensible meaning and effect to a statute, and to make the deed available, rather than to render it abortive and of none effect. Accordingly we find that our Court of Appeals, in the case of Barzizas v. Hopkins, 2 Ran. 276, decided, that the provision contained in the act of 1783, “that children wheresoever born, whose father’s or .mothers are or were citizens at the time of the birth of such children,’’ should ’ be so construed as to give to the word' are a prospective meaning, so as to embrace within the clause future cases, whilst the word were comprehends past cases, and that the word are should not be construed to have a present signification; and that, according to the case before them, the act should be construed as if the words were, whose fathers or mothers may be citizens at the time of the birth of such children, or were citizens at the time of their birth, &c.
The case of Bache v. Proctor, 1 Doug. 382, is a very apt one to shew that in covenant’s the courts áre not confined to the literal term of the bond, but will imply one covenant from another, in order to meet the justice and good sense of the case. That was an action *of debt upon bond with collateral condition, brought against a county treasurer and his securities, the condition of which was to account fdr, but nothing said about paying over the money that should come to his hands. I believe the plaintiff contented himself with' declaring upon the parol part of the bond, and the defendants craved oyer of the’ bond and condition, and pleaded that the principal had well and truly accounted, which, in a literal sense he had, having settled the account showing the true balance against him; to which there was no objection. To this plea the plaintiff replied, that although he had settled, he had not paid over. To this replication the defendants demurred, fiord Mansfield would not hear an argument iti support of the demurrer, holding that the duty and obligation to account included the obligation to pay over. Judge Buller, in delivering a short opinion in the case, concurring with Mansfield, stated that he once knew a case where the condition of the bond was that it should be void if the party did not pay, in which the court had no hesitation in reading if as if the word not was expunged.
' T will bring my remarks to a conclusion, already extended beyond my anticipations, after stating one or two supposititious cases,' which by their analogy to the one we aré considering, will servé the purpose of á further and apt illustration of my viéws. Suppose an executor or administrator were to enter into a bond with securities, conditioned for the faithful performance of the duties of his office, which may be' prescribed by law: and the bond was not held void, because of the variance • between it and the form prescribed by law; what construction would any count place upon such a bond — that the words “which may be prescribed by law,” had a prospective and exclusive import and bound the executor or administrator and his securities to the performance of no duty but that which should be subsequently “prescribed by law?” or that those words meant nothing more than the law would have implied ^without them, and that instead of an exclusively prospective meaning, their meaning was rather exclusively present or retrospective, or if not, then that their meaning was retrospective, present and prospective? Suppose, in the case of the executor, the words had been, which may be prescribed by law and the will of the testator, (which would be a very natural condition if the parties departed from the form of the statute,) how is it possible the words could be held prospective as to the will of the testator, if by possibility they could be so held as to the law, so as to require future legislation to give any validity to the bond? There could be no possibility of a future prescription of duty 'by the will of the testator, and the improbability of future legislation to furnish the future prescription of duty by law, would place both parts of the condition in the same category. So that the court would have to hold one of two constructions: that the parties either intended to make a bond to bind the administrator to the performance of the duties of the office, whether theretofore, then or thereafter to be prescribed by law; or what would be tantamount to binding him to nothing, by limiting it to a subsequent prescription by law, which might never be made. I cannot doubt how such a case would be decided. But suppose in the case put the bond would be held void, both as a statutory and common law bond as to the securities, because of its departure from the form prescribed by the statute. I will remove that difficulty, by supposing the executor or administrator to have given bond and security in exact accordance with law, and one of the sureties, becoming dissatisfied with his undertaking, calls upon the executor or administrator for a bond of indemnity or counter bond, and it is jjiven out of court, and one is given with the conditions above mentioned, and conditioned to indemnify and save harmless the security in the event of a failure to perform in all things the duties of the office, which may be prescribed by law; is it possible that any court would hold that this bond imposed *no obligations upon the executor or administrator and the securities until "the duties of executor or administrator were thereafter prescribed by law? Such an absurdity could not for a moment be entertained by any judicial mind, if indeed it could be entertained by any mind governed by the dictates of common sense. It seems to me the cases supposed and the one under consideration are analogous, and that for the same reason *761 that we should not give to the executorial or administration bond an exclusively prospective construction, we should not give it to this. The principle of the two cases is the same — the only difference is in the degree of absurdity resulting from the application of such a construction to either.
I could multiply analogies of this kind, drawn from the official bonds of the various officers and fiduciaries known to our laws, state and federal, but I forbear — ex uno disce omnes.
I am, therefore, of opinion, that this bond covered the breaches of duty assigned in the first count or breach of the declaration precisely to the same extent and as fully as if the bond had been conditioned for good behavior in office, or for the faithful performance of the duties of the office, omitting the words, “which may be prescribed,” &c., and that the first was the true and proper breach; that, instead of sustaining, the court ought to have overruled the demurrer to that breach, and should have given the instruction asked by the plaintiff’s counsel, which assumed or took for granted the sufficiency of the said first breach.
TYBER, J., and EIEBD, P., concurred ■with THOMPSON, J.
GIBMER, J.
This is an important case, both on account of the amount of money and the principles involved, and it has been argued with an earnestness, learning and ability, commensurate with its importance. The principal question, and that on which the case *mainly turns, is the meaning of the condition annexed to the bond in controversy. It was at one time held in some of the United States, in accordance with the English rule, that corporations could only contract by their corporate seal, and consequently that as-sumpsit could not be maintained against a corporation at all; this doctrine, however, has been entirely exploded, and it is now well settled, that the acts of a corporation, evidenced by vote, written or unwritten, are as binding upon it, and are as complete authority to its agents, as the most solemn acts done under the corporate seal; and that promises may as well be implied from its acts and the acts of its agents, as if it had been an individual. It having been established, that corporations might contract otherwise than by their corporate seal —that they might make parol promises, either by vote or through their agents authorized to do so, no reason can be found why they.should not be subject to the same presumptions as natural persons. Angell and Ames on Corporations, 229-230, and cases cited in note.
It is also well settled, that contracts and covenants are to be construed according to the common sense and understanding of mankind, and that the relations of the contracting parties to each other and the circumstances by which they are surrounded at the time, may be taken into consideration to aid the courts in arriving at just conclusions. 2 Parsons on Contracts, 40-41; 2 Smith’s Beading Cases, 10, (and notes).
Tested by these plain and sensible rules, what is the meaning of the condition of the bond in controversy?
It seems the Exchange Bank was organized in 1837, and that Patrick Durkin had been cashier from its foundation to the time when the bond was executed. The condition sets forth, that Durkin, previous to its date, ‘ ‘had been elected and appointed cashier of the bank;” so that, when the bond was executed, Durkin was cashier. He derived his powers, not from the bond, but from his previous appointment. The bond and security were required — 1st, . because the law so directed. 2d, to ^secure the bank against loss; and 3d, (as I understand it,) to empower the Board to superadd to the duties devolving on the cashier virtute officii such other and further duties as the Board might prescribe ; thus enlarging, and not contracting, their powers on this subject.
Does any one suppose, that Durkin or his securities expected the Board to inform him with regard to the ordinary routine duties of his office? or that they expected the Board, after he had been re-elected, and the keys of the vault put in his possession, to inform him that he was to keep the money safely thus entrusted to his care? or that he would have known it any better after a formal resolution had been adopted and spread on the journal of the bank, than he did before? His conduct and that of the Board and of the securities, (two of whom were directors at the time,) show the contrary. Durkin entered immediately on the discharge of his duties, and there is no evidence that he ever applied to the Board for any instructions. If he had informed the Board that he was ready to enter upon the discharge of his duties as soon as they would prescribe them, and had waited for instructions, and in consequence of their failure to give them, a loss had fallen on the bank, the case would be a very different one. Or, if it were doubtful whether the duty of keeping the money devolved on him or on some other officer, there would be more plausibility in the defence; but when he had so long held the office, which from its title makes him the keeper of the money — when he was deriving all the benefits and receiving all the emoluments of that office, he should be held bound to discharge the duties belonging to it, and not allowed to ignore its first and plainest duty imposed by the title itself.
Indeed, it might with great force be argued, that Durkin waived any prescription of duties at all by his conduct in this case.
It was strenuously contended by the appellant’s counsel, that the duties of the cashier should have been prescribed by the Board formally, in its official capacity, *and entered in the journal, and that they could not properly be prescribed in any other way. I do not see anything in the act of Assembly or the by-laws re *762 ferred to, to justify any such conclusion. The act simply requires the Board “to appoint a cashier and all subordinate officers, fix their compensation, define their powers, and prescribe their duties;” and section 17 of the by-laws provides, “that the directors of the offices of discount and deposit shall appoint their respective officers, whose particular duties, not otherwise provided for, shall be prescribed by the respective directors of said offices.” There is no particular form designated in which these duties are to be prescribed, and if there were, a due prescription might be inferred from circumstances. Angell and Ames on Corporations, p. 230-290.
The appellant’s counsel also argued, that the prescription of the duties of cashier, and entry on the journal, are a condition precedent, without the performance of which the appellee could not recover on the bond. If a man were to employ a carpenter to build a house, and agree to furnish him all the materials for building, this would be a plain case of a condition precedent, and if the carpenter insisted on a compliance with it, the employer could not maintain an action for breach of the contract, without showing a performance, or a readiness to perform this condition on his part; but even in the case supposed, if the carpenter should go on with the building, and by his misconduct cause a loss to the employer, in a suit by the employer against him, the presumption would be almost irresistible, either that the employer had furnished the materials, or that the carpenter had waived that part of the contract.
The condition does not provide, that said Durkin shall well and truly and faithfully perform 'such duties of said office as shall be prescribed by the Board of Directors, much less does it provide that he shall perform such duties and such only — and this interpolation would be necessary to give it the meaning contended for by the appellants. This construction,. I think, too narrow. *The condition provides that he shall perform the duties of cashier, “which may be prescribed,” &c., and this, I think, is merely permissive, or at the most directory.
I do not think it any answer to this action, for Durkin and his securities to say; that the Board have not complied with their duties in the mode of prescribing those of the cashier. If, indeed, the3 have been guilty of any such violation, they are answerable in another way, and it constitutes no defence for them. Nor should we be deterred (as was argued by the appellants’ counsel) from holding the appellants liable on their bond, on the ground that by so doing we will be giving countenance to a dereliction of duty on the part of the Board. The precedent would be a much more dangerous one, if we should for such reasons discharge the appellants from the payment of their bond.
It follows, as a corollary, from what has •been said, that I think there is no error in .the judgment of the circuit court overruling the demurrer to the declaration, or the demurrers to the second and fourth breaches assigned, or in rejecting the pleas to said breaches. Nor do I think there is any error in the instructions given by the court, or any inconsistency (as was argued) between the instruction first given, and the explanation given by the court afterwards, or in refusing to give the instructions asked for by the appellants, or in admitting the evidence excepted to, or in overruling the motion for a new trial. I have not deemed it necessary to make any particular commentary on the various cases cited by the counsel on both sides; most of them are collected in Angelí and Ames on Corporations, to which reference has been ■ made, and I think establish clearly the positions taken in that work. For these reasons, I am for affirming the judgment of the circuit court.
CLOPTON, J., was for affirming the judgment.
Judgment affirmed.