THE FIDELITY AND CASUALTY COMPANY *v.* THE GATE CITY NATIONAL BANK.

1. Under a contract by which a fidelity and casualty company binds itself to make good to a bank, to a specified extent, such pecuniary loss as the latter may sustain by reason of the fraud or dishonesty of a named employee in connection with his duties as receiving teller, "or the duties to which, in the employer's service, he may be subsequently appointed or assigned by the employer," it is the right of the bank, without notifying the company, to confer upon this employee the office of assistant cashier in addition to that of receiving teller; and, upon this being done, the company is as much bound to make good to the bank losses occasioned, during the period covered by the contract, by reason of the employee's fraud or dishonesty while acting in the capacity of assistant cashier as in that of receiving teller.

2. Although the contract may have required the bank, upon the discovery of any fraud or dishonesty on the part of such employee, to give notice thereof to the company, and also, immediately after knowledge by the bank of the occurrence of any act on his part involving a loss to the company of more than $100, to notify the company of the same; yet where such contract contained no stipulation making it in the least degree incumbent upon the bank to exercise any diligence or care in inquiring into or supervising the conduct of this particular employee, or of any of his coemployees in its service, and imposed upon it no duty of vouching for the fidelity or efficiency of the latter, or of requiring them to watch and report upon his actings and doings, information or knowledge on the part of the bank's cashier, he being only such a coemployee, as to the matters concerning which the company had stipulated for notice, would not, relatively to it, be, under these circumstances, imputable to the bank itself.

3. Where, to an action by the bank upon such a contract, the defendant filed an amendment to his plea, which amendment alleged that the employee had, within the knowledge of the bank, been guilty of a specified default, such amendment not being legally complete without further alleging that the plaintiff had failed to duly notify the defendant of the default in question, was properly stricken on demurrer.

4. The contract stipulating for proof of loss satisfactory to the company's officers, and that full particulars of any claim arising upon the contract should be given in writing, addressed to the secretary of the company, within a specified time; and the declaration alleging compliance with the foregoing terms of the contract, but not alleging that there had been any waiver of the requisite proof of loss; and the evidence entirely failing to show that the same had been duly furnished, the plaintiff did not prove its case as laid, and it was error to refuse a nonsuit. This is true although the plaintiff introduced evidence for the purpose of proving a waiver by the defendant of such proof of loss; and it is immaterial whether this evidence was, or was not, legally sufficient to establish the alleged waiver.

January 13, 1896.

Action on bond. Before Judge Van Epps. City court of Atlanta. July term, 1895.

*John L. Hopkins & Sons*, for plaintiff in error.
*Dorsey, Brewster & Howell*, contra.

LUMPKIN, Justice.

In view of what we consider the controlling questions in this case, it is not essential to deal specially with the numerous assignments of error contained in the record, and we shall therefore confine our remarks to the points upon which we have found it necessary to rule.

1. The Fidelity and Casualty Company (to which we shall hereinafter refer as the "Company") undertook by its bond to make good to the Gate City National Bank of Atlanta (which will hereinafter be called the "Bank,") such pecuniary loss, not exceeding $10,000.00, as it might sustain by reason of the fraud or dishonesty of Lewis Redwine in connection with his duties as receiving teller, "or the duties to which, in the employer's service, he may be subsequently appointed or assigned by the employer." He was afterwards appointed assistant cashier, and, as such, was guilty of conduct which caused loss to the Bank in an amount far exceeding the face of the Company's bond. One of the questions for decision is, whether or not the Company was surety for him in the latter capacity. In view of the comprehensiveness of the above quoted language, it would be difficult to hold it was not. He was certainly appointed, subsequently to the execution of the bond, to the office of assistant cashier; as such, had duties to perform in his employer's service, and by a violation of those duties brought loss to his master. We think the plain language of the contract covers the precise state of facts which arose, and that the Company is as much bound to answer to the Bank for the consequences of Redwine's dishonesty in the latter capacity as in the former.

2. The main question in the case is whether or not, under the stipulations expressed in the contract, the knowledge of the Bank's cashier of fraud or dishonesty on the part of Redwine, or of any act done by him involving a loss to the Company of more than $100.00, was imputable to the Bank itself. This case does not fall within the general

rule applicable to banks in their dealings with the general public. Much of a bank's business is necessarily entrusted to its subordinate officials or servants, and in a large number of instances it will, upon the doctrine of constructive notice, be held to know what comes to their knowledge. This rule is founded upon necessity, and has for its object the protection of those who deal with and trust the bank. The transaction out of which this bond grew was of an altogether different kind from those usually occurring between a bank and its customers. The contract was not made for the purpose of protecting the Company in any dealings it might have with the Bank; but on the contrary, the Company undertook to protect the Bank in the matter of delegating some of the duties it owed to others to Redwine for performance in its behalf. In other words, the Company agreed to save the Bank from loss, to a limited extent, by reason of its thus trusting Redwine. As naturally incident to a contract of this nature, the Company stipulated that the bank should gain no benefit thereunder if it continued in its service an employee known to be unworthy of trust, without prompt notice to the Company after he had been discovered by the Bank to be untrustworthy. There is not a syllable in the contract, however, bearing the construction that the Bank should exercise any degree of diligence in inquiring into or supervising the conduct of Redwine, in order that the Company might be saved from loss through his misconduct. The Bank did not undertake to exercise reasonable care and diligence to find out if Redwine had become untrustworthy; but as to this matter, the Company, in effect, invited the Bank to repose in peace; for it guaranteed that Redwine would remain honest and faithful. Only after knowledge had actually come to the Bank that he was, or had become, otherwise, was it under any duty to the Company; and then, it was only required to immediately notify the Company of what it had ascertained. This bank, it seems, was conduct-

ing its business in the manner usual with such institutions, having a cashier, assistant cashier, receiving and paying tellers, bookkeepers, etc.   It was not, so far as the Company was concerned, under any duty of keeping itself informed as to the conduct of Redwine.   The Company must have known and contemplated that the Bank's business was to be carried on through its employees, including Redwine; and yet, it entered into a contract which does not even suggest that it should be protected if any of these employees other than Redwine should fail in the duty they undoubtedly owed the Bank of informing it of any misconduct on his part.   Evidently, the Company chose to rely solely upon the care which the Bank would most probably exercise in protecting itself, and consequently did not require any fixed supervision over Redwine, being willing to content itself with the assurance that the interests of the Bank would necessarily require such a supervision of him as would, in all probability, enable the Bank to obtain actual knowledge of any fraud, dishonesty or negligence of which he might be guilty.

In the light of the foregoing considerations, we cannot think that the parties to this contract contemplated that the Bank would be bound to act upon mere constructive notice of Redwine's shortcomings.   The "knowledge" referred to meant *actual* knowledge.   Constructively, whenever Redwine—he being an employee of the Bank handling its money—misapplied the same, the Bank itself would have immediate notice of the fact; for his knowledge, as a servant of the Bank, would, if the doctrine of constructive notice were applicable, be its knowledge.   Surely, the contract cannot be construed as contemplating any such result as this.   Again, suppose another employee was colluding with Redwine in concealing his shortage; the knowledge of such other employee would be, constructively, the knowledge of the Bank.   Or, suppose Redwine and another employee, also under bond, were both misappropriating the

Bank's funds, and each found the other out.   Could it be said in defense to a suit on Redwine's bond that the other employee's knowledge was the knowledge of the Bank? or, when suit on the other employee's bond was entered, that Redwine's knowledge was constructive notice to the Bank, and the legal equivalent of the "knowledge" referred to in the Company's bond?

In the absence of any guarantee on the part of the Bank that its other employees would be honest and faithful, and in view of the purpose of the condition inserted in the bond, it would seem that the better construction of it would be that the Bank only obligated itself to act in good faith and impart only *actual* knowledge on its part.   The bond would, indeed, be of no practical protection if, in order to realize its benefits, the Bank had to insure, not only the honesty and fidelity, but the faithful and conscientious attention to duty, of a dozen others of its employees.   Stupidity of an employee in not comprehending ordinarily apparent facts and circumstances which would be equivalent to actual knowledge if within the knowledge of the Bank itself, might lead to a forfeiture of the bond; while forgetfulness or mere negligent inattention to duty on the part of such employees would, bring about the same result.

The cashier, according to the undisputed testimony in this case, was a mere employee.   Unless the Bank obligated itself to use his eyes and ears, it had no *knowledge* of Redwine's misconduct.

The following cases throw much light upon the subject under consideration:   In Pittsburgh &c. Railroad Co. *v.* Shaeffer, 59 Pa. St. 350, s. c. 8 Am. Law Reg. (n. s.), 110, it was held that where an officer of a corporation violates his duty, knowledge on the part of other officers of the corporation of the default, or even connivance in it, does not discharge the sureties.   In that case, the defaulting employee had given a bond, with sureties, for the faithful discharge of his duties.   In delivering the opinion of the

court, Sharswood, J., says: "Corporations can only act by officers and agents. They do not guarantee to the sureties of one officer the fidelity of the others. The rules and regulations which they may establish in regard to periodical returns and payments are for their own security, and not for the benefit of the sureties. The sureties, by executing the bond, become responsible for the fidelity of their principal. It is no collateral engagement into which they enter, dependent on some contingency or condition different from the engagement of their principal. They become jointly obligors with him in the same bond and with the same condition underwritten. The fact that there were other unfaithful officers and agents of the corporation, who knew and connived at his infidelity, ought not in reason, and does not in law or equity, relieve them from the responsibility for him. They undertake that he shall be honest, though all around him are rogues. Were the rule different, by the conspiracy of the officers of a bank or other moneyed institution, all their sureties might be discharged. It is impossible that a doctrine leading to such consequences should be sound. In a suit by a bank against a surety on the cashier's bond, a plea that the cashier's defalcation was known to and connived at by the officers of the bank, was held to be no defense.   Taylor *v.* Bank of Kentucky, 2 J. J. Marsh. 564."

In the latter case, it would seem that a mother bank established a branch, putting it into the hands of a directory for management, and itself appointing a cashier, requiring of him a bond. In speaking of a plea filed in defense to a suit upon the bond, Judge Robertson said, pages 569, 570: "It imputes to the directory of the branch bank only a knowledge of the delinquencies of the cashier, and a connivance at them. It was their duty, if they had any such knowledge, to communicate it to the mother bank. And if they failed to do it, there would be more reason for charging them with fraud on the mother bank, than for

imputing to it any fraud on the sureties of the cashier. It is not the presumption of either law or fact, that everything known to the branches is communicated to the principal bank. The cashier of a branch is an agent of the mother bank; the directors of the same branch are other agents of the same parent institution. Suppose these several agents combine to defraud their principal, is the one excused by the fact that the other is *particeps?* Is the surety of one exonerated, because the other has co-operated in the malfeasance? Or suppose one connive at a fraud or improper conduct of the other, is the employer responsible, because one of its agents knew of the delinquency and might have prevented its recurrence? The legal maxim, '*Qui facit per alium facit per se,*' does not apply to such a case. The connivance of the branch is not that of the mother bank. The fraud of the branch is not that of the mother institution, because, if the plea be true, there was a tacit combination of the agents to injure the principal. If A employ a principal to transact particular business, and exact from him security for his fidelity, and constitute another agent to perform other associate and supervisory functions, surely, if they both conspire to defraud their constituent, the security shall not be permitted to say that the act of the agent is that of the principal."

Brandt, in his work on Suretyship and Guaranty, §369, recognizes and approves the doctrine laid down in the cases above referred to, and says, "If the sureties of one officer of a corporation could be relieved from liability by the neglect of duty of other officers of the corporation, the corporation would be deprived of all remedy." See additional cases cited by the author.

The above authorities will suffice to show that the doctrine of constructive notice has no application to transactions such as that in the present case. Not having required the Bank to insure the fidelity of all its other employees as

v 97–41

a condition precedent to recovery on Redwine's bond, the Company cannot take advantage of the failure of duty on the part of one of the Bank's employees.    Undoubtedly it was the duty of McCandless, the cashier, to inform the Bank as to any misdoings of Redwine of which he knew.    This was, however, a duty he owed the Bank and not the Company, which could only derive a benefit therefrom by express stipulation in its contract to the effect that it should be entitled to have such duty of McCandless to the Bank faithfully performed.    The Bank suffered from such neglect to a far greater extent than did the Company, whose liability under its bond was limited in amount;    and surely, the Bank is not equitably estopped from claiming a benefit under the bond which it expressly stipulated for.

3. The insufficiency of the amended plea referred to in the third head-note is obvious.    Even actual knowledge by the Bank of a default on the part of Redwine would not, of itself alone, release the Company from liability.    It was further essential to this result that the Bank should fail to notify the Company of the default in question, as it had contracted to do.    As this plea alleged no such failure, it stated no valid defense to the action, and was properly stricken.

4. The fourth head-note points out what we regard as a fatal variance between the *allegata* and the *probata*.    An allegation that the Bank had furnished the proof of loss stipulated for by the contract, could not be sustained by evidence tending to show that the defendant had waived such proof of loss.    For this reason, it was error to deny a nonsuit.                            *Judgment reversed.*