# CHARLESTON.

WAIT, EXECUTRIX v. HOMESTEAD BUILDING ASS'N *et als.*

Submitted January 27, 1915.   Decided June 1, 1915.

1. CORPORATIONS—*Officers—Fidelity Bond—Defaults Covered.*

   The fidelity bond of an officer or agent of a private corporation, conditioned generally for faithful performance of the duties of his office or employment, is construed to cover defaults in such duties as are annexed to the office or employment at the time of the execution thereof and such additional ones as shall be subsequently annexed to it in the exercise of corporate power.   (p. 435).

2. PRINCIPAL AND SURETY—*Officers—Fidelity Bond—Liabilities of Sureties.*

   The sureties are deemed to have known such additional duties could and might be annexed and to have contracted with reference thereto.   (p. 437).

3. CORPORATIONS—*Principal and Surety—Officers—Ambiguous By-Law —Fidelity Bond—Liability of Surety.*

   Interpretation of an ambiguous by-law of a private corporation is a function within the province and power of the board of directors, and, in so far as such power affects the liability of the sureties of an officer or agent of the corporation, they are deemed to have been cognizant of it and to have contracted with reference thereto.   (p. 440).

4. SAME—*By-Laws—Construction by Directors—Authority—Authority of Officers.*

   No formality is essential to the devolution of power or authority upon a corporate officer, by the board of directors, or to their construction of an ambiguous by-law.   Such results may arise from conduct and methods of transacting business.   (p. 440).

5. BUILDING & LOAN ASSOCIATIONS—*Ambiguous By-Law—Construction.*

   By-laws of a building association, requiring weekly meetings of the board of directors for the purpose of receiving dues and other demands from the stockholders and attendance of the treasurer thereat, but not expressly inhibiting him from receiving dues at other times and places, is ambiguous and subject to construction by the directors and officers of the corporation.   (p. 440).

6. SAME—*Authority of Treasurer—Acquiescense of Directors.*

   The authority of the treasurer of an association operating under such a by-law, to receive dues, premiums, interest and fines, for and on its behalf, at times and places other than those of the weekly meetings, is established by proof of his having done so for a long

76 W. Va.

period óf time, with the knowledge and acquiescence of the board of directors. (p. 440).

7. PRINCIPAL AND SURETY—*Default of Officer—Constructive Notice—Duty of Corporation—Sureties.*

Mere constructive notice to a corporation of a default on the part of an officer or employee imposes no duty upon it to give notice thereof to his sureties or dismiss him from its service. Nor does such notice impose duty to make the default known to persons who are about to become his sureties in a subsequent bond. (p. 444).

8. SAME—*Fidelity Bond—Notice of Default.*

Admission of a shortage, by the treasurer of a corporation, to directors and other officers thereof, accompanied by an explanation exculpating him from personal fault and dishonesty and followed by his representation that he had fully made it good, is not sufficient to prove the directors and officers had reason to believe the treasurer fraudulently procured persons to become his sureties in bonds subsequently given by him to guarantee faithful performance of his prospective duties as such treasurer. (p. 444).

9. COMPROMISE AND SETTLEMENT—*Corporate Officers—Settlement of Default—Presumptions.*

A settlement of such default is not inferable from mere payments on account thereof and representation by the defaulting officer that he had fully made up the shortage. (p. 443).

10. PRINCIPAL AND SURETY—*Officers—Fidelity Bond—Release of Sureties.*

A loan of money to the defaulting officer, secured by a deed of trust and credited on his shortage is not an extension of time, releasing the sureties in his bonds. (p. 444).

11. CORPORATIONS—*Officers—Terms of Bonds.*

Bonds given annually by a corporation officer annually elected and conditioned for faithful performance of duty during the term and until the election and qualification of a successor hold only during the terms and for reasonable times thereafter. (p. 449).

12. SAME—*Defaulting Officer—Equity—Issues.*

It is not error to dismiss out of a suit to wind up a corporation and enforce liability of the sureties of the treasurer, the settlement of the accounts of the trustees in an assignment made by the treasurer for the benefit of his creditors. (p. 450).

13. LIMITATION OF ACTIONS—*Fidelity Bond—Corporate Officer—Demurrer to Bill.*

A demurrer to so much of a bill as applies to a bond, liability on which is barred by the statute of limitations, is properly sustained. (p. 450).

(MILLER, JUDGE, absent.)

Appeal from Circuit Court, Wood County.

Suit by Bettie C. Wait, executrix, etc., against the Homestead Building Association and others. From decree for plaintiff, the defendant Union Trust & Deposit Company appeals.

*Reversed in part. Remanded.*

*F. P. Moats,* for appellant.

*V. B. Archer,* for appellee Bettie C. Wait. *Reese Blizzard,* for appelle J. T. Peadro. *William Beard,* for appellee Abram Smith. *W. M. Straus,* for appellees Straus and Smith.

POFFENBARGER, JUDGE:

The complainant on this appeal is the special receiver appointed in the cause of *Lamp* v. *The Homestead Building Association,* instituted under the circumstances and for the purposes, disclosed in the opinion of this court, filed on the appeal in that cause and reported in 62 W. Va. 56. The decree complained of now was made and entered in the cause of *W. H. Wolfe* v. *The Homestead Building Association et als.,* the purpose of which was the relief of said Wolfe as surety on several bonds given by Fischer as treasurer of the association. With leave of the court, the special receiver intervened in that suit and filed an answer and cross-bill, for the purpose of holding Fischer and his sureties to alleged liabilities for defalcations on his part, amounting to something like $70,-000.00. By elaborate pleadings which it is unnecessary to set forth in detail, the issues just indicated were fully developed and a great deal of testimony taken. Pending this suit, Wolfe died testate and Bettie C. Wait was appointed the executrix of his will. Fischer made an assignment, for the benefit of his creditors, to W. M. Straus and Abram Smith, trustees. He afterwards died and J. T. Peadro qualified as the executor of his will. Straus and Smith were sureties in some of the bonds as well as trustees in the assignment. The decree appealed from relieves the estate of Wolfe and other sureties from liability on the five bonds, each in the penalty of $10,000.00, and perpetuates an injunction restraining and inhibiting the defendants from prosecuting any suit or suits against him or his estate on said bonds; and, according to

Fischer, his trustees and executors the benefit of the statute of limitations, denies all relief against them.

As will appear by reference to the opinion in *Lamp* v. *Building Association,* The Homestead Building Association was organized in 1874 and did business until early in the year 1905. In January of that year, an auditing committee was appointed, and, upon their report, the stockholders adopted a resolution to discontinue the association and surrender its charter and franchises. They also adopted a resolution appointing the Commercial Banking and Trust Co. trustee for the purpose of winding up its affairs under the orders and direction of the board of directors then in office. The occasion of the dissolution was the revelation of insolvency of the association due to the alleged defalcations of the treasurer.

The fidelity bonds give by Fischer were dated, respectively, June 29, 1894, May 27, 1895, August 16, 1898, June 2, 1899 and July 12, 1900. Another bond alleged to have been given by him in June 1896 has not been established by the evidence, and it is not disclosed that any bond was given in 1897. One of the grounds upon which the trial court absolved the sureties from liability, receipt of money from stockholders at Fischer's private place of business, his shoe store, and at times other than the dates of the meetings of the board of directors, relieves as to all of them, if good as to any, for this practice obtained throughout the whole period of his service as treasurer.

This defence is founded upon the rule requiring strict construction of the contract of suretyship in favor of the surety, the by-laws of the association, prescribing the duties of the treasurer, being regarded as part of the contracts. They made it his duty to "receive all moneys as soon as paid into the association," giving proper receipts therefor, "pay all orders drawn on him" and signed by prescribed officers, deposit the moneys received by him in some bank in Parkersburg, W. Va., and be present at all meetings of the board of directors. They further prescribed stated meetings of the board of directors, to be held each week, at such place as they should appoint, "for the purpose of receiving from the stockholders their weekly dues, interest, premiums, fines, etc."

The condition of each of the bonds was that the treasurer should "well and truly perform the duties of the said office of treasurer of said association during his term of office or until his successor be duly elected and qualified," and "well and truly comply with the laws and constitution of the said association," in that behalf made and provided.   All were made payable to the association by its corporate name.

That the building association itself is not liable to stockholders for dues paid to its treasurer or other collecting agent, at a place other than that prescribed by the by-laws, is the expressed opinion of some of the courts.   *Morrow* v. *James,* 4 Mackey, (D. C.), 59; *Sachs* v. *Duckworth B. & L. Assn.,* 6 Ohio Dec. 254.   From the digest of these cases, found in the note to *Louchheim* v. *Building Assn.,* 3 Am. & Eng. Anno. Cas. 728, this view seems to have been carried into actual decision.   Though not necessary to the disposition of the case, it was stated as a ground of the decision in *Van Wagener* v. *Savings Ass'n,* 88 Hun. (N. Y.), 43, 34 N. Y. Supp. 491. Lack of a provision in the by-laws, inhibiting payment or receipt of dues, except at the weekly meetings, justified payment elsewhere, in an action between a stockholder and the association, in the opinion of the court, in *Schutte* v. *B. & L. Assn.,* 146 Pa. St. 324.   The provision of the association constitution, relied upon in that case, was very general and indefinite in its terms, however, and the court construed it as merely fixing "the amount of the dues, and when payable," evidently meaning the amount of dues and maturity thereof, the time within which they must be paid to prevent forfeitures or penalties.   The conclusion of the court, however, was founded solely upon its construction of the by-laws.   It held the association bound by the interpretation its own officers had placed upon them, right or wrong, a perfectly sound legal proposition, as applied between the parties to the action. *Tyler* v. *Building Association,* 87 Ind. 323, an action by the association on the bond of the treasurer, does not say whether payments elsewhere than at the meetings were valid or not. The sureties were held liable on the theory that the secretary had received the money in his official character, whether paid at the times required or not.

The rule *strictissimi juris* invoked here is not a rule of

construction. It is operative only in the application of the contract, after its meeting has been ascertained in the manner in which the intent of the parties to other contracts is found. Brandt, on Sur. & Guar. sec. 107, citing ample authority. There is no liability beyond the meaning of the words used. *State* v. *Wotring,* 56 W. Va. 394; *State* v. *Barnes,* 52 W. Va. 85; *State* v. *Enslow,* 41 W. Va. 744. In all of these cases, the laws under which the bonds were given were read into them as parts thereof and the liability of the sureties carried, on the one hand, and limited, on the other, to that which fell within the terms, the words of the contract so read.

Like bonds of public officers and guaranties, these bonds are collateral undertakings. They are not contracts to pay money at all hazards and in any event. Being collateral, there is no liability on them, unless the contract to which they are collateral has been broken. Unlike bonds of public officers, the principal obligation to which they are collateral, is created by contract and not by law. Moreover, the principal in the bonds, though called an officer was really an agent. He was not a public officer, charged with the performance of duties imposed by law. Therefore, resort cannot be had to the law for the collateral undertaking. To hold the sureties liable as for acts done under color of authority, because Fischer assumed to act as treasurer in the receipt of money for the association, at his place of business, would be obviously inconsistent with the fundamental proposition just stated and applied. Only public officers can do acts *colore officii,* and their bonds differ radically from these. Their purpose is to guarantee the good conduct of the officer in the general sense of the terms. Such a bond is payable to the state, from necessity and for convenience, so as to allow any person injured by the wrongful act of the officer, in the performance of his official duty, to sue on it in the name of the state. *Lammon* v. *Feusier,* 111 U. S. 17. It being impossible to know who will be so injured, the bond cannot be made payable to him or them. The law protects the citizen from wrongful acts done in the execution of the office, abuse or perversion of its power, and the law is a part of the undertaking guaranteed by the bond. The condition of the bond is that the officer will faithfully execute his office. His abuse of power breaks the

condition, violates the letter of his undertaking, and likewise the letter of his bond. Nobody can sue on a bond guaranteeing the performance of a private contract, but the obligee or his assignee or personal representative. It does not protect strangers to it, as does the bond of a public officer. It is not made on behalf of the public or for the benefit of every citizen, like a bond guaranteeing faithful performance of public duty, but only for the benefit of the immediate parties thereto. Color of office can have no place in it, for there is no office. Application of the rule giving indemnity for acts done under color of office would extend the contract beyond its terms by implication, in flagrant violation of the basic principle of the law of suretyship and guaranty. Agreeably to this view, it has been held the bond of a treasurer of a private corporation is not broken by his exposure of corporate property to be attached, refusal to furnish bills to assist a collector, or action with others in an effort to dissolve the corporation. *Literati* v. *Heald*, 141 Mass. 326.

For the same reason it is impossible consistently to say the money was received by virtue of the treasurer's office, in the sense of the phrase, *virtute officii*, as defined in the reported cases. All of the judicial declarations respecting acts done *colore officii* and *virtute officii* and making the distinction between them, pertain to public offices and officers. The position involved here was not, in any sense, such an office. In so far as it was an office at all, it was a private one, like an agency. It was representative, not of the public, but of a private corporation, an artificial citizen. Its functions did not concern or affect the stockholders or anybody else as citizens. They had interests in the corporation, the treasurer's employer, his principal, but not as proprietors or owners of its property or funds. Each owned shares of its capital stock. Formally, primarily and legally, the fidelity bonds were obligations to the corporation and no one else. It alone could sue on them. In them the stockholders had no legal interest. Their equitable rights respecting them come through the legal right of the corporation, whose representative the treasurer was to the extent of the authority conferred upon him, as other agents are representative of their principals.

Bonds of agents and officers of private corporations are

governed by principles altogether different from those applicable to official bonds, as regards the liability of the sureties; and yet a sort of analogy appears. The powers and duties of a public officer may be enlarged or diminished by legislation, from time to time, and the rights and liabilities of the sureties in his bond contract and expand in conformity with the variations of his powers, for the law enters into the contract and the surety is presumed to have known, contemplated and foreseen the possibility of such variation and contracted with reference thereto. In like manner, the surety of an agent or officer of a private corporation is presumed to have known the stockholders and board of directors might diminish or enlarge the scope of the authority of such agent or officer, and are deemed to have obligated themselves for the care, diligence, skill and honesty of the principal in the bond, respecting the performance of the duties imposed upon him at the time of the execution thereof and also such duties as may be subsequently devolved upon him in the exercise of corporate power. In *Minor* v. *Mechanics Bank of Alexandria*, 1 Pet. U. S. 40, 73, Mr. Justice Story expounded the law of the subject as follows: ''The bond of the Cashier must be construed to cover all defaults in duty, which are annexed to the office from time to time, by those who are authorized to control the affairs of the bank; and the sureties are presumed to enter into the contract, with reference to the rights and authorities of the President and Directors, under the charter and by-laws.'' In agreement with this principle are the decisions in *Collier* v. *So. Express Co.*, 32 Gratt. 718; *Allison* v. *Bank*, 6 Rand. 294; *Durkin* v. *Bank*, 2 Pat. & H. 277; *Railroad Co.* v. *Kasey*, 30 Gratt. 218; *Melville* v. *Doidge*, 6 Man. G. & S. 450; *Bank* v. *Lamkin*, R. M. Charlt. (Ga.) 29 and *Fidelity etc. Co.* v. *Bank*, 97 Ga. 634. See also *Bank* v. *Auth*, 87 Pa. 419 and *Bank* v. *Elwood*, 21 N. Y. 88. In each instance, there must be authority in the principal, conferred by the state, in the form of law, when the bond of a public officer is involved, and by the employer, by way of direction, prescription, assent, order or the like, when the question of liability of the surety on the bond of a private officer or agent arises. No reason why this element of liability on an official bond should not be required in the case of a private

bond, is perceived; but one or two decisions found apparently dispense with it. *Tyler* v. *Building Ass'n.*, 87 Ind. 323; *Pendleton* v. *Bank*, 1 T. B. Monroe, (Ky.), 171. In the first of these two cases, there seems to have been no evidence of any authority in the secretary of the association to receive dues elsewhere than at meetings. In the other, the sureties on a cashier's bond were held liable for money given to him on the street for deposit, and there was no evidence of his authority so to receive it. The court observed: "We view a cashier as holding his office at every time and place, and if, at any time different from the hours of banking, or at places far remote from the banking house, he shall convert the funds of the bank to his own use, the institution has the right to recover such funds, on his official bond." But no authority for the proposition was cited. Mr. Morse, in his work on banking, explains it as not asserting right in the cashier to receive the money under such circumstances, but only as asserting liability on account of subsequent ratification of the unauthorized act. Morse, Banks and Banking, sec. 25. If this view is sound, it justifies the decision in *Tyler* v. *Building Ass'n.*, for the association adopted the unauthorized act of its secretary by its action on the bond for the money.

This suggestion of the theory of ratification is ordinarily not possible in the case of official bonds, for there only the legislature has the power of ratification. As the scope of the officer's power and authority is defined by law, his unauthorized act could be ratified only by a retrospective, retroactive law which the legislature alone may pass and laws of that class are not often made. But all private principals or employers may, and often do, ratify voidable acts of their agents and servants and the ratification may be implied as well as express. Moreover, the adoption of the unauthorized act, by ratification, relates back to the time of the act, making it the same in legal effect as if it had been previously authorized. The suggestion of liability as the result of ratification seems to be consistent with the principle adopted in *Minor* v. *Bank*. If the surety is deemed to have bound himself, not only as to acts within the principal's authority at the date of the obligation, but also as to acts within the limits of authority, which he knew could and might be subsequently

conferred, as held in that case, the view that he knew the employer had power to ratify unauthorized acts and might do so, and, therefore, contracted with reference to such power in him and the probability of its exercise and so bound himself for unauthorized, but ratified, acts as well as authorized acts, is clearly within the general principle. The difference lies only in the time and manner of validation of the act, and, if the surety is deemed in the one case to have anticipated grounds of liability and covered them by his contract, it is difficult to find any reason for saying he did not do so in the other.

From these conclusions it results that the contract of suretyship was not collateral to a special or specifically defined main contract. The principal in the bonds was an agent with powers and duties indicated only in a general way. The condition of each of the bonds recited the election of Fischer to the position of treasurer and bound him to "well and truly perform the duties of the said office during his term or until his successor be duly elected and qualified" and to "well and truly comply with the provisions of the by-laws and constitution." Observe that it does not limit his duties to those prescribed by the by-laws. The terms are general. The second clause is not a limitation of the first. It is additional. His duties were such as his employer had already prescribed for him and such additional ones as it might subsequently impose upon him. The limits of his potential authority were those of the corporation itself, respecting matters pertaining to the treasurer's functions, such as the receipt and custody of its funds. Rules governing the liability of sureties in bonds collateral to clearly defined and limited contracts, undertakings to do specific acts, applied in *Ware* v. *Calvert,* 2 Nev. & Per. 126; *Ryan* v. *Morton,* 65 Tex. 258; *C. & A. R. Co.* v. *Higgins,* 58 Ill. 128; *Charles Brown Co.* v. *Vasson,* 68 S. W. 204; *Ins. Co.* v. *Loewenberg,* 120 N. Y. 44, and *Ins. Co.* v. *Johnson,* 20 Ill. 622, are, therefore, not applicable.

Upon the inquiry as to what authority could have been and was given, the by-laws are to be considered, of course. As against the corporation, the board of directors could not impose duties or functions inhibited by the by-laws, but nothing in them forbade payment or receipt of dues elsewhere than

at the board meetings. Sec. 2 of article 9, prescribed stated meetings for the purpose of receiving dues, etc., and sec. 3 of article 6, required the treasurer to attend such meetings and receive all moneys as soon as paid into the association, but neither of these provisions, in terms or by necessary implication, prohibited the payment of dues to any officer at other times or places. Being indefinite and silent as to that, they were susceptible of interpretation, a function clearly within the province and power of the board of directors as a managing and governing body. The general principle stated, as determinative of questions arising on bonds of the class to which these belong, bring this power of interpretation within the contract. The sureties bound themselves for the treasurer's faithfulness and skill as to all duties the board had power to impose, in so far as they should be actually imposed, and determination of the extent of its powers involved interpretation of the by-laws, when necessary. This function, from necessity, falls, in the first instance, into the hands of the board itself, for there is no other body to whom it can go, unless it would be the stockholders who ordinarily hold only one meeting a year and always delegate the management of the corporate business to the directors. If they have a power of·supervision or review of the action of the board, the latter manifestly has power and authority to act in the first instance and its action stands unless annulled. Courts recognize and adopt the construction of an ambiguous by-law, placed upon it by the corporation itself. Morawetz Cor. sec. 497; *State ex rel.* v. *Conklin*, 34 Wis. 21, 29; *Breneman* v. *Franklin etc. Ass'n.*, 3 W. & S. 218.

All of the depositions were excepted to because the notice referred to in the certificate is not annexed, the certificate does not show they were read by the witnesses and none of them bear the signatures of the witnesses. The first objection is obviated by the appearances of the parties and the second by the statute, dispensing with signatures to depositions taken in shorthand and transcribed. Code, ch. 130, sec. 33, serial sec. 33.

Many of the books of the association, fully identified by witnesses, were put in evidence, but have not been brought up on the appeal. Among them are blotters and cash books.

A daughter of the secretary assisted him for several years, prior to June or July, 1899, and she details the method of transacting business at the weekly meetings, which the directors presumptively attended, because they were required by the by-laws to do so, under penalties of small fines for failures and forfeitures of their offices for absence for four successive meetings. Collections in large amounts were made at Fischer's shoe store and reported at the weekly meetings. In the tabulation thereof on the blotters, the collections at the meetings and at the store were distinguished, the former being entered in black ink and the latter in red. From this blotter, the accounts of the members were entered in what was termed the roll-book. The reports of these large store collections at the weekly meetings and presumptively in the presence of the directors cannot reasonably be deemed to have been unknown to them. They seem to have been far greater than the collections at the meetings. Each stockholder had a pass-book. Such of them as paid dues at the store never came to the meetings, of course, nor were their books there. It is reasonable to suppose they would not pay their money without obtaining receipts in their books. Their absence, the absence of the books and the reports of the collections constituted conclusive evidence of the practice of the treasurer. From these facts, the directors must have known, not only that he was receiving dues elsewhere than at the meetings, but also receipting for them in the pass-books. If, having accepted the money, he had brought it to the meeting and receipted the book there, his action would have imported agency for the stockholders. But his report of it as collections, together with his action in receipting for it elsewhere, could have suggested nothing short of exercise of the powers of his office at his store. Obviously the acquiescence of the directors in this practice was a construction of the by-laws. They tacitly assented to it, believing the by-laws did not inhibit it. Assuming their construction to have been wrong, it was corporate action valid and binding between the treasurer and the corporation, unless annulled by the stockholders. And their tacit approval of the action of the treasurer under the by-laws was tantamount to authorization of subsequent acts of the same kind as well as ratification of antecedent ones. To confer

authority upon a corporate agent for transactions of the kind involved here, no formality is necessary. It may arise out of the conduct of the parties. *Minor* v. *Bank,* 1 Pet. (U. S.), 46, 72.

Three results are said to flow from a transaction on the part of Fischer with the association, on or about Jan'y. 10, 1898. He borrowed $5,000.00 from it, in the usual manner, securing payment thereof by a deed of trust, and took the withdrawal value of certain shares of its stock held by him, amounting to about $1,300.00, both of which sums he left in the treasury and took credit therefor, on his account as treasurer. At about the same time he delivered to some representative of the association a certificate for certain shares of stock in another corporation. These facts evidence the existence of a shortage in his accounts at that time. It is claimed a settlement was then made, which bars right of action on the first two bonds given in 1894 and 1895. The other contentions are that the loan constituted a binding contract of extension of time, working a release of the sureties on said first two bonds and that the knowledge, on the part of the directors, of the defalcation, necessarily incident to the settlement, imposed a duty upon them in favor of the sureties in the subsequent bonds, which, having been omitted, rendered such bonds voidable.

No settlement is established by the evidence relied upon. No witness says any adjustment took place between the treasurer and the board of directors. The witness who speaks on the subject knew only what Fischer had told him about the shortage and what he had done by way of making it good. The dead secretary may have had something to do with it, as he and the treasurer gave the association affairs more attention than anybody else did, but whether he made any investigation such as characterizes a settlement does not appear. What are relied upon as evidence of a settlement are the *ex parte* acts of the treasurer. He borrowed $5,000.00 from the association and placed that with the withdrawal value of certain shares of stock to his credit, as payments upon what he owed. These items together with others the treasurer represented he had turned in made about $10,-000.00, which he claimed would make up the amount due.

There was no admission of any dishonesty. The shortage was attributed to a loss in the bank in which the treasurer kept his association money deposited, by means of a defalcation of an employee of the bank. Neither the witness nor any one else, except the treasurer, so far as his evidence discloses, ever knew the extent of the shortage or made any effort to ascertain it, or knew whether it had been made good. The representations of the secretary and the treasurer were accepted as to the existence of the shortage, its amount and the adjustment thereof. All the directors did about the matter was to make the $5,000.00 loan. The president had actual knowledge of the application thereof to the shortage, and some of the directors may have had, but it does not appear that they did. After the treasurer said he had made good the shortage, the annual statement of the association was prepared and given out, representing it to be in a prosperous and sound condition. This was a statement to the stockholders, not a settlement with the treasurer. No inference of a settlement can arise from these facts.

Nor did the loan constitute an extension of time. It merely changed the character of the $5,000.00 from a debt due from Fischer as treasurer, secured by his bonds, to one due from him individually and secured by a deed of trust and operated as a payment to the association on the shortage as treasurer.

Lack of uniformity in the authorities as to the right of persons about to become sureties, to rely upon the silence of the obligee in the instrument as a representation of the trustworthiness of the principal, gives an opportunity for argument of which counsel for the appellees have availed themselves. The decisions of the Indiana and Minnesota courts, tending to sustain their positions, do not seem to be in accord with the weight or tendency of the current of authority, nor with the views of this court as expressed by Judge GREEN in *Warren v. Branch*, 15 W. Va. 21. Judge GREEN's opinion, concurred in by the other members of the court, disapproves the broad doctrine of Lord Campbell in *Rawlton v. Matthews*, 10 Cl. & Fin. 934, and adopts the more restricted views expressed in *Owen v. Haman*, 3 Man. & G. 378, 4 H. L. Rep. Cas. 1035, making it the duty of the creditor to warn the surety of the unworthiness of the principal, only when the dealings are

such as fairly to lead a reasonable man to believe fraud must have been used in the procurement of the suretyship. The tendency of the courts generally is to adopt the principle applied in *Railway Co.* v. *Shaeffer*, 59 Pa. St. 350, founded upon considerations stated by Judge Sharswood as follows: "Corporations can act only by officers and agents. They do not guaranty to the sureties of one officer the fidelity of the others. The rules and regulations which they may establish in regard to periodical returns and payments are for their own security, and not for the benefit of the sureties. The sureties, by executing the bond, become responsible for the fidelity of their principal. It is no collateral engagement into which they enter, dependent on some contingency or condition different from the engagement of their principal. They become joint obligors with him in the same bond, and with the same condition underwritten. The fact that there were other unfaithful officers and agents of the corporation, who knew and connived at his infidelity, ought not in reason, and does not in law or equity, relieve them from their responsibility for him. They undertake that he shall be honest, though all around him are rogues. Were the rule different, by a conspiracy between the officers of a bank or other moneyed institution, all their sureties might be discharged. It is impossible that a doctrine leading to such consequences can be sound." As to the effect of the rules and regulations of the corporation and the consequences of omission to enforce them, he adopted the conclusion of Mr. Justice Story, in *U. S.* v. *Kirkpatrick*, 9 Wheat. 720, respecting the reliance of sureties upon the enforcement of the federal laws and stated in the following terms: "It is admitted, that mere laches, unaccompanied with fraud, forms no discharge of a contract of this nature between private individuals. Such is the clear result of the authorities. Why, then, should a more rigid principle be applied to the government—a principle which is at war with the general indulgence allowed to its rights, which are ordinarily protected from the bars arising from length of time and negligence? It is said that the laws require that settlement should be made at short and stated periods; and that the sureties have a right to look to this as their security. But these provisions of the law are created by the govern-

ment for its own security and protection, and to regulate the conduct of its own officers. They are merely directory to such officers, and constitute no part of the contract with the surety. The surety may place confidence in the agents of the government, and rely on their fidelity in office; but he has the same means of judgment as the government itself, and the latter does not undertake to guaranty such fidelity." In *Fidelity etc. Co.* v. *Bank,* 97 Ga. 634, the question' was whether a stipulation in a surety bond requiring the bank, upon discovery of fraud or dishonesty on the part of the guaranteed employee, to give notice to the surety and also, immediately after knowledge by the bank of any act on the part of the employee, involving a loss to the surety of more than $100.00, to notify the surety of the same. In disposing of it, Justice Lumpkin said: "As naturally incident to a contract of this nature, the Company stipulated that the bank should gain no benefit thereunder if it continued in its service an employee known to be unworthy of trust, without prompt notice to the Company after he had been discovered by the Bank to be untrustworthy. There is not a syllable in the contract, however, bearing the construction that the Bank should exercise any degree of diligence in inquiring into or supervising the conduct of Redwine, in order that the Company might be saved from loss through his misconduct. The Bank did not undertake to exercise reasonable care and diligence to find out if Redwine had been untrustworthy; but as to this matter, the Company, in effect, invited the Bank to repose in peace; for it guaranteed that Redwine would remain honest and faithful. Only after knowledge had actually come to the Bank that he was, or had become, otherwise, was it under any duty to the Company; and then, it was required to immediately notify the Company of what it had ascertained. * * * * "The 'knowledge' referred to meant *actual* knowledge. Constructively, whenever Redwine—he being an employee of the Bank handling its money—misapplied the same, the Bank itself would have immediate notice of the fact; for his knowledge, as a servant of the Bank, would, if the doctrine of constructive notice were applicable, be its knowledge. Surely, the contract cannot be construed as contemplating any such result as this. Again, suppose another employee

76 W. Va.

was colluding with Redwine in concealing his shortage; the knowledge of such other employee would be, constructively, the knowledge of the Bank. Or, suppose Redwine and another employee, also under bond, were both misappropriating the Bank's funds, and each found the other out. Could it be said in defense to a suit on Redwine's bond that the other employee's knowledge was the knowledge of the Bank? or, when suit on the other employee's bond was entered, that Redwine's knowledge was constructive notice to the Bank, and the legal equivalent of the 'knowledge' referred to in the Company's bond?

In the absence of any guarantee on the part of the Bank that its other employees would be honest and faithful, and in view of the purpose of the condition inserted in the bond, it would seem that the better construction of it would be that the Bank only obligated itself to act in good faith and impart only *actual* knowledge on its part. The bond would, indeed, be of no practical protection if, in order to realize its benefits, the Bank had to insure, not only the honesty and fidelity, but the faithful and conscientious attention to duty, of a dozen others of its employees. Stupidity of an employee in not comprehending ordinarily apparent facts and circumstances which would be equivalent to actual knowledge if within the knowledge of the Bank itself, might lead to a forfeiture of the bond; while forgetfulness or mere negligent inattention to duty on the part of such employees would bring about the same result.''

Likewise the Supreme Court of the United States denies any duty on the part of the employer to exercise diligence to ascertain whether the employee has defaulted or done any act indicative of untrustworthiness, to the end that the sureties may be protected, and repudiates the view that the doctrine of constructive notice applies to the subject. In *Fidelity etc. Co.* v. *Courtney*, 186 U. S. 342, the trial court instructed the jury that the cashier's knowledge of the infidelity and fraud of the president of the bank was not notice to the bank, of which the sureties could avail themselves as a ground of discharge. A stipulation of the bond required the bank to observe or cause to be observed due and customary supervision over the employe for the prevention of default and

absolved the surety from liability in case of the condonation by the employer of any dishonest act or default or continuation of the employe in service, after such default, without written notice to the company. After having approved and adopted the views expressed in *Railway Co.* v. *Shaeffer*, cited, Mr. Justice White delivering the opinion of the court, sustained the ruling of the trial court and went even further, saying: ''The provision is not that a minority in number of the board of directors or the subordinate officers or agents would exercise due and customary supervision, and would not condone a default of the bonded employe or retain him in his employment after the commission of a default, but the agreement is that the bank would do or not do these things. This in reason imports that the things forbidden to be done or agreed to be done were to be either done or left undone by the bank in its corporate capacity, speaking and acting through the representative agents empowered by the charter to do or not to do the things pointed out.''

The inquiry here is not the correctness, in all respects of the propositions and observations just quoted, but only whether the sureties are discharged by reason of the failure of the association to give them such knowledge as it possessed, concerning the previous irregularity in the conduct of their principal as its treasurer. Under the rule announced in *Warren* v. *Branch,* 15 W. Va. 21, it was under no duty to inquire or give warning, unless the circumstances were such as would have induced belief on the part of a reasonable man, that the treasurer had fraudulently procured the sureties to join him in the execution of the bonds. From what has been said concerning the defalcation, it is obvious that none of the directors had any actual knowledge of dishonesty on his part, or of any loss by his negligence. Admitting his shortage, he attributed it to the bank in which he kept his deposits and represented that he had fully replaced all that had been lost. Beyond this, there may have been grounds for fear or suspicion, but not any knowledge of any fact casting reproach upon the honor of the treasurer. Having no knowledge of any fraud on his part against their association, the directors could not consistently assume or suspect any fraud in his transactions with those who became, or were about to become,

his sureties. Of course, a thorough and exhaustive investigation of the books and accounts of the association would have revealed the error of the treasurer's opinion as to the cause of his embarrassment or the untruthfulness of his statement, but the documentary evidence of his payments on account of a shortage, as and for the full amount thereof and more, read in the light of his explanation, was no evidence of fraud or dishonesty. Under the decisions to which reference has been made, declaring the prevailing rule, with which *Warren v. Branch* is believed to be in agreement, the directors were not bound to make an investigation to the end that they might be able to advise the sureties. Mere constructive notice of a default is not enough to impose duty to a surety. Actual knowledge is required.

That some of the bonds involved were given after the defalcation is immaterial. The duty to a new surety cannot, in the nature of things, be greater than that due to an existing or continuing one. Brandt, Sur. & Guar., sec. 477. If the subsequent bonds had been given to cover past transactions and the association knew of an existing default, not made good, its acceptance of the new bonds to cover it, would have been a fraud on its part, according to authorities cited and analyzed in *Warren v. Branch,* but these bonds were all prospective only.

A written opinion of the chancellor expresses his inability to determine, with sufficient certainty to enable him to make a finding, the amount of the default within the period covered by any one of the five bonds involved, they being annual and successive, from 1898 to 1900. The two prior bonds established were executed in 1894 and 1895. As to whether any bond was given in the year 1896, an issue has been made and decided in favor of the sureties. None was given in 1897. With the exception of the year 1897, the treasurer was elected annually up to and including the year 1900. Each bond was conditioned for faithful performance of duty during the term of office and until the successor should be elected and qualified. Failure to elect for the year 1897 raises a question as to liability on the preceding bonds. If no bond was executed in 1896, one question is the extent of the liability on the bond of 1895.

Obviously none of these bonds were given as continuing obligations. In each case, the election of a successor and procurement of a new bond was contemplated. Under such circumstances, the bond continues only for a reasonable time after the date on which the election and qualification of the successor should have taken place. Brandt, Sur. & Guar., sec. 187, citing numerous authorities sustaining the text.

As the evidence makes it fairly clear that portions of the collections made at the store never reached the bank in which the treasurer's account was kept and that all the losses were from those collections, no difficulty in ascertaining liabilities, with reference to the periods of the several bonds, is perceived, Immediate deposits of the collections in some bank were required. All of those made at the weekly meetings were so deposited, and weekly deposits were made of sums derived from the other collections, but in some way not disclosed, large discrepancies between such collections and the deposits therefrom occurred.

Individual liability of Fischer was held to have been barred by the statute of limitations. He was not such a trustee as could have been sued only in a court of equity for money due from him as treasurer. To prevent the application of the statute of limitations to a trust, two characteristics are essential. The trust must be express and the cause of action cognizable only in equity. *Beecher* v. *Foster,* 51 W. Va. 605; *Rowen* v. *Chenoweth,* 49 W. Va. 287; *Newberger* v. *Wells,* 51 W. Va. 624; *Thompson* v. *Whittacker Iron Co.,* 41 W. Va. 574. This is not such a trust. It is express, but an agent may be sued at law for an accounting. He is not like a guardian or personal representative, having the legal title to the ward's property or the decedent's estate, in consequence whereof the ward, distributee or legatee, having no legal title or right, must resort to equity for lack of a remedy at law. Assumpsit by the principal against the agent for money had and received by the latter to the use of the former lies for money collected or received by the agent. *English* v. *Deverro,* 5 Blachf. (Ind.) 588; *Seidel* v. *Perchkew,* 27 N. J. L. 427; *Eaton* v. *Welton & Co.,* 32 N. H. 325. Of course an action at law on the bond of such an agent or officer for money misappropriated or withheld would lie at any time.

How the trial court, under the operation of the five year statute of limitations, wholly relieved the estate of Fischer from liability, is not perceived. The cross-bill, having for one of its purposes an accounting from him, was filed, Oct. 12, 1907. From that date, five years would go back to Oct. 12, 1902. But the bill filed in Lamp's suit brought, Aug. 5, 1905, sought an accounting from Fischer as treasurer. Surely that suit suspended the statute as to his individual liability, and, from that date, five years would run back to Aug. 5, 1900. Besides his estate is liable on the bonds, in so far as they cover his defalcations, and that liability goes back ten years from Oct. 12, 1907, and beyond, unless the statute of limitations has been, or shall be, invoked against it. The Lamp bill was not a suit on the bonds. As to them, it merely sought the appointment of a receiver with power and authority to sue on them.

The demurrer to the cross-bill and answer was properly overruled. It was not foreign to the subject matter of Wolfe's bill for relief from liability. The question of his liability was the very essence of his bill. Denying it, he sought a discharge. Affirming it, the receiver sought a decree for the amount thereof. Hence, the subject matter of the cross-bill and that of the bill, were identical. Variance between the prayers characterizes every bill and cross-bill. If they had to be the same, a cross-bill would be unnecessary, as well as impossible. There could be no cross purpose in the suit.

There may be some inadmissible evidence in the record, but, as this is an equity suit in which the chancellor and not a jury passes upon the evidence and makes the findings of fact, the good can be separated from the bad, and the presence of inadmissible testimony does not preclude consideration of such portions as are admissible. It is said the blotter, kept by the secretary, from which the accountants made up their statement is not a book of original entry. That may be, but there was a cash-book kept by Fischer himself, in which the footings of receipts differ but slightly from those in the blotter. The balance founded on the figures taken from the blotter may be too large, but, if the statement had been made from the cash-book, there would have been a balance due. Hence, though inadmissible testimony may be found in the

record and the shortage may not have been correctly ascertained by the accountants, the chancellor will undoubtedly be able, by resort to the cash-book, to see that there is a liability. In pronouncing the decree of dismissal, the court made no examination of the evidence pertaining to the question of shortage. The dismissal rests entirely upon other and untenable grounds. The evidence is amply sufficient to establish a *prima facie* case of liability.

Further complaint is made of a decree of March 10, 1908, dismissing W. M. Straus and Abram Smith, trustees in the Fischer assignment, from so much of the cross-bill as required them to settle their accounts, as such in this suit, and of another decree of June 20, 1908, sustaining the demurrer of Fischer to so much of the cross-bill as is predicated on the bond of June 9, 1895, on the ground of preclusion of right to relief respecting it by the statute of limitations. No error in either of these decrees is perceived. The forum in which the accounts of the trustees shall be settled is unimportant. A proper settlement, wherever made, will disclose the amount of the estate in their hands, and, if none is made, they can be compelled to discover and pay it over. If an improper *ex parte* settlement should be made, it may be corrected. As right of action on the bond of June 9, 1895 is clearly barred and the bar of the statute may be invoked in a chancery cause, against a purely legal demand, by demurrer, *Maxwell* v. *Wilson*, 54 W. Va. 295, the decree of June 20, 1908, is not erroneous.

The decree of March 10, 1908 and June 20, 1908, will be affirmed and the decree of May 6, 1914, reversed and the cause remanded.

*Reversed in part.   Remanded.*