# CHARLESTON.

PIEDMONT GROCERY COMPANY *v.* ARTA F. HAWKINS *et al.*

Submitted September 21, 1920.   Decided September 28, 1920.

1.   PRINCIPAL AND SURETY—*Notice of Principal's Defalcation Held to Satisfy Provision for "Immediate Notice."*

"Immediate notice" to the surety of any defalcation by the principal, required in a fidelity bond, as a condition of liability, does not require literal interpretation.   As soon as may be reasonably practicable, without unreasonable or unnecessary delay, within a reasonable time, or with reasonable diligence, equivalent terms, are regarded by the courts as satisfying the condition of the bond.   (p. 42).

2.   SAME—*Fidelity Company Denying Liability is Estopped as to Grounds Not Stated in its Refusal.*

Where the surety in such fidelity bond, with knowledge of the facts respecting such notice, denies liability solely on other grounds, he will be regarded as having treated the notice given as sufficient, or waived notice, and after suit brought on the bond will be estopped to deny liability on grounds other than those stated by him for his refusal to pay the loss incurred by the insured.   (p. 43).

3.   SAME—*Statute Prohibiting Writing of any Contract Other Than That Plainly Expressed in Policy Does Not Apply to Fidelity Companies.*

The provisions of section 15 of chapter 34 of the Code, inhibiting life, fire and casualty companies from writing any contract therefor other than as plainly expressed in the

policy issued thereon, does not apply to fidelity and guaranty companies. The business of such companies is controlled by chapter 54C of the Code, containing no such provision in regard to the form or substance of the contract. Such bonds are otherwise controlled by the general law of contracts. (p. 46).

4. SAME—*Provision of Fidelity Bond Requiring Audit of Books and Accounts of Principal Held Complied with by Usual Audit by Committee of Insured's Directors.*

The statement of the insured in such fidelity bond to the bonding company as a condition of entering into the contract, that the books and accounts of the agent or officer whose honesty and fidelity are to be guaranteed will be audited by the auditing committee at least twice a year as a means of ascertaining whether his accounts are correct, does not contemplate or require an audit by an expert bookkeeper or accountant, but is satisfied in the case of a corporation by an audit in the regular course of business by a committee of the directors appointed for that purpose, as such audits are generally made. If in such case the auditing committee acts without fraud and in good faith, the conditions of the bond with respect to such audit have been complied with. (p. 47).

SAME—*Statement as to Making all Required Audits and as to Absence of Defalcation would not Discharge Liability on Fidelity Bonds, Though Audits Had Not Discovered Prior Defalcations.*

The statement of the insured or his officer or agent to such bonding company as a basis for securing the annual renewals of the bond, on blank forms furnished by the insurer or otherwise, based on the report of the auditing committee, that the books and accounts of the officer whose fidelity and honesty are to be guaranteed have been examined from time to time in the regular course of business and found correct, and that all moneys and property in his control or custody have been accounted for with proper securities on hand to balance his accounts, and that he was not then in default and had performed his duties in a satisfactory manner, where the facts so certified so appear from such audits, will not be regarded false and fraudulent so as to discharge the surety from liability on the bond, although it is subsequently ascertained that such officer had then committed defalcations and by false entries and forgeries had so concealed the same that they were not discovered by such audits of his books and accounts. (p. 50).

87 W. Va.

6.   SAME—*Statement in Renewal Certificate That No Change Had Occurred in Conditions of Principal's Employment as Secretary-Treasurer Held Not Falsified by His Outside Collections and Receipt of Orders.*

The further fact stated in such certificate to the surety for a renewal of the bond, that "no change had occurred in the terms or condition of the officer's employment," was not falsified by the fact that during the term of the bond he had left his office of secretary-treasurer and visited customers to make collections, and had incidentally in connection therewith solicited or received orders for goods. Making collections in that manner was clearly within his duties as secretary-treasurer, and his incidental and voluntary solicitation or receiving of orders for goods constituted no material change in his employment, so as to invalidate the bond. (p. 51).

7.   SAME—*Statement in Application for Fidelity Bond That Employer Never Sustained Loss Held Not Falsified by Default of Former Employe Which Had Been Made Good.*

The statement in the application of the insured for such bond of indemnity, in answer to a question, that he had never sustained any loss by anyone holding the same position as the one whose fidelity was to be guaranteed, is not falsified by the fact known to the surety or his agent that a prior employee in the same position had been in default, but had made good his default and no loss had been sustained by the insured. (p. 52).

8.   SAME—*Fidelity Bond Renewed from Year to Year is a Continuing Contract, Entitling Insured to Recover for Defaults Occurring at any Time During its Continuance.*

Such a bond of indemnity renewed annually as provided therein, limiting the liability of the insurer to the penalty stated therein and no more, constitutes but one continuing contract, and the insured is not limited in his recovery thereon to items of default occurring and discovered within six months after the expiration of such renewals, but may recover items of default occurring at any time during the continuance of the bond so renewed, discovered during such continuance or within six months after the expiration thereof, or the death, dismissal or retirement of its principal from the services of the insured as stipulated in the bond.  (p. 53).

(WILLIAMS, PRESIDENT, absent.)

Error to Circuit Court, Mineral County.

Action by the Piedmont Grocery Company against Arta F.

Hawkins and the United States Fidelity & Guaranty Company and others. Demurrer of defendant United States Fidelity & Guaranty Company, surety on the fidelity bond of defendant Hawkins, to plaintiff's evidence sustained, and plaintiff adjudged to take nothing by suit, and plaintiff brings error.

*Reversed; judgment for plaintiff.*

*Harry G. Fisher,* for plaintiff in error.

*Horace P. Whitworth* and *Chas. N. Finnell,* for defendants in error.

MILLER, JUDGE:

The judgment to which this writ of error is prosecuted, pronounced December 30, 1919, sustained the demurrer of the defendant United States Fidelity & Guaranty Company, surety on the fidelity bond of defendant Arta F. Hawkins, to the evidence of the plaintiff, and adjudged that plaintiff take nothing by its suit and that defendant recover its costs.

The bond originally executed by principal and surety, dated August 15, 1906, was renewed annually thereafter, subject to the same covenants and conditions, up to August 15, 1918, whereby said surety, for the consideration stipulated and on the faith of the statement in writing referred to therein, agreed to make good and reimburse plaintiff to the extent of the sum of ten thousand dollars and no further, all and any pecuniary loss sustained by it, of money, securities, or other personal property in the possession of the principal, or for the possession of which he was responsible, by any act of dishonesty on the part of said principal, in the discharge of the duties of his office or position as set forth in the statement referred to, amounting to larceny or embezzlement, and which should be committed during the continuance of said bond or any renewal thereof, and discovered during said continuance or within six months from his death or dismissal, or retirement from the service of plaintiff within the period of said bond, whichever of these events should happen first.

The declaration setting forth said bond avers default of the principal therein while employed by plaintiff as secretary-treasurer and during the continuance thereof, in the sum of $20,707.-

39, exclusive of interest, and there is no controversy as to the amount of the defalcation, nor as to the making and execution of the bond and renewals thereof, nor as to the covenants and agreements therein contained.

On the trial defendant company pleaded or gave notice that it would rely on certain breaches of the covenants and conditions of the bond by plaintiffs, and the plaintiff replied thereto that certain of them were not in fact parts of the bond, or that the conditions and warranties had been waived by the defendant. For the purposes of this writ we need consider only those matters of defense relied on by the defendant company to sustain the judgment on the demurrer to the evidence.

The first of these defenses was that plaintiff failed to give defendant "immediate notice" upon the discovery by it of the default of Hawkins. Plaintiff's reply was that the notice given was immediate within the meaning of the conditions of the bond, but whether so or not defendant had waived this condition in the manner set forth in its replication. The judgment below, as evidenced by the written opinion filed, was predicated solely on the condition that the notice of default was not immediate within the meaning of the bond. The evidence shows that on November 7, 1917, the expert accountant employed by plaintiff to audit the books and accounts of Hawkins, discovered that Hawkins was short in his cash account in the sum of $11,860.98, and that his attention being called to the discrepancy, he admitted to the accountant that he was in fact short in that sum; that this fact was on the same or the following day communicated by the accountant to Samuel Bradley, a director of the plaintiff company and also a member of the regular auditing committee of the company, and was also communicated to the general manager, Dye, some ten days before the meeting of the directors called for November 21, 1917, to consider the subject. The evidence further shows that at this meeting the accountant made his report, and the subject of the shortage of Hawkins was taken up and conidered, and the accountant directed to continue his audit and :o back beyond the time to which his previous work had taken im. The first notice of the defalcation which was given de-

fendant company was contained in the letter of H. B. Carroll, president of plaintiff company, written and addressed to de-fendant, December 3, 1917, twenty-five days after the shortage was first discovered by the accountant and communicated to Bradley and perhaps to one or two of the other directors.

The circuit court, after reviewing many authorities on the subject, considered that this notice did not amount to imme-diate notice within the conditions of the bond, and that it had not been waived. After considering this phase of the de-fense we are not prepared to entirely agree with the conclu-sion reached by the learned judge below. As we view the case, however, we think the evidence shows there was a waiver by the defendant of this covenant or condition of the bond. The court below was of a different opinion, based upon the theory that there could be no waiver by defendant without knowledge of the fact upon which it depended. This leads us to a con-sideration of the fact of such knowledge, as to which there seems to be no controversy, and what in law amounts to a waiver. The court below and counsel on both sides agree that under the authorities "immediate notice" called for in such a bond of indemnity does not require literal interpretation. "As soon as reasonably practicable under the circumstances," "without unreasonable and unnecessary delay," "within a rea-sonable time," or "with reasonable diligence," which are con-sidered equivalent terms, are said to satisfy the condition re-lied on. *Fidelity & Deposit Company* v. *Courtney,* 186 U. S. 342; *Foster* v. *Fidelity & Casualty Company,* 40 L. R. A. 833; *Cady* v. *Fidelity & Casualty Company,* 17 L. R. A. (N. S.), 260; *Larrabee* v. *Title Guaranty & Surety Company,* (Pa.) L. R. A. 1916F, 709, note 715.

But we are not disposed to further consider this question, for as intimated, other or more timely notice was waived. In disposing of the subject of waiver the court below considered that defendant company was deceived by the letter of Decem-ber 3, 1917, saying: "We are *today advised* by Wm. A. Gilles-pie & Co., certified public accountants * * * that they have discovered a shortage in the accounts of our Secretary-Treas-urer, Arta F. Hawkins, amounting to approximately Twenty

Thousand Dollars, not including interest;" and by the letter of plaintiff's attorney to defendant, of December 24, 1917, saying: "You were notified of this matter some weeks ago, *as soon as the shortage* was discovered." It is conceded, however, and the evidence shows, that as early as January 15, 1918, Mr. J. H. Knapp, in charge of the matter for defendant company, was advised by Mr. Anders, the accountant who audited the accounts of Hawkins and discovered the shortage, that he had discovered this fact November 7, 1917. The circuit judge says this was not notice to the company of the default on that date, and does not satisfy the condition of the bond. But this, we submit, is not the real point in issue. Concededly Knapp knew by that letter that plaintiff had discovered through Anders the shortage of $11,860.98 as early as November 7th, and he knew the first notice given the company thereof was December 3rd. Did Knapp or his company then repudiate liability on this ground? There is nothing in the record showing such denial; on the contrary Knapp, signing himself "Executive Special," continued to carry on correspondence with plaintiff soliciting additional information in relation to the claim, up until March 5, 1918, and at no time, though fully advised of the date of Anders' discovery on November 7th, did he deny liability of his company for want of timely notice. And finally, with all the additional information acquired, on March 5, 1918, he wrote the plaintiff company denying liability and repudiating the plaintiff's claim upon the following grounds, and on them alone: First, breach of alleged warranties respecting the method of conducting the business, the keeping of accounts, etc., the fact as claimed that as late as August 24, 1917, plaintiff had certified to his company that the books and accounts of Hawkins had been examined and found correct in every respect; that all matters in his custody and control were accounted for, and that he was not in default; that these representations continued from year to year: Second, that the bond was originally issued with the distinct warranty that plaintiff's books would be systematized and so kept and so frequently audited that irregularities would be discovered, and that it had developed that the business had not been properly conducted by

Hawkins, and that his irregularities dated back many years; that the defendant viewed the case in that light, and would not have issued and renewed the bond except upon those warranties as to keeping of books and frequent audits, and would not have continued the bond from year to year except upon receiving from plaintiff certificates that everything was all right. Nowhere does Knapp or any other officer prior to suit appear to have denied liability on the ground of want of notice, or on any ground other than those stated in this letter of Knapp's of March 5, 1918.

Now what is the rule of law applicable in such cases? Referring first to our own cases, we find it decided in *Houseman* v. *Globe & Rutgers Fire Ins. Co.,* 78 W. Va. 586, that if the insurer after being furnished an imperfect or incomplete proof of loss, resists payment on the sole ground that the insured was not the owner of the property, he thereby waives further proof of loss and is estopped to set it up as a defense when sued on the policy; citing for the proposition *Pennsylvania Fire Ins. Co.* v. *Hughes,* 108 Fed. 497. In *Morris* v. *Dutchess Ins. Co.,* 67 W. Va. 368, we decided that denial by an insurance company of liability on certain specific grounds is in legal effect a waiver of the conditions of the policy depending on other grounds. In *Moore* v. *The National Accident Society,* 38 Wash. 31, it was decided that where the secretary of an insurance company resisted payment and refused to treat with the insured solely on the ground that notice was not given within the time limited, the company was estopped in an action on the policy to set up the defense that proofs of loss were not furnished within the time required after giving notice; citing *Hennessy* v. *Niagara Fire Ins. Co.,* 8 Wash. 91; *Castner* v. *Farmers' Mut. Fire Ins. Co.,* 50 Mich. 273. In *The Farmers' Alliance Ins. Co.* v. *Ferguson,* 78 Kans. 791, it was held that where an insurer bases its refusal to pay a loss solely upon a breach of one condition of the policy, it can not when sued thereon maintain a defense founded upon violation of another condition thereof, of which it had notice when liability was denied and payment refused. In *Towle* v. *The Ionia etc. Mut. Fire Ins. Co.,* 91 Mich. 219, the court held that where an insurance company with full knowl-

edge of the facts bases its refusal to pay a loss solely upon the failure of the insured to state in his application for insurance the true condition of the title to the property, after which he is subjected to loss of time in attempting to adjust the claim and incurs the expense of bringing suit for his money, the company is estopped from asserting some other claim of forfeiture not specified as a defense in said suit. Other cases illustrating its application and applying the rule are: *Western & Atlantic Pipe Lines Co.* v. *Home Ins. Co.,* 27 A. S. R. 703; *Trippe* v. *Provident Fund Society,* 35 N. E. 316; *Delaware State Bank* v. *Colton,* 170 Pac. 992; *Crystal Ice Co.* v. *United Surety Co.,* 123 N. W. 619; *Burnham* v. *Casualty Co.,* 117 Mich. 142; *Roark* v. *City Trust, Safe Dep. & Surety Co.,* 110 S. W. 1; *Citizens Trust & Guaranty Co.* v. *Globe & Rutgers Fire Ins. Co.,* Ann. Cas. 1917C 416. Here is a wealth of authorities on this important point, and we think decisive of the case on the question of waiver.

The second proposition relied on to sustain the judgment is that no audit of the accounts of Hawkins, secretary-treasurer, was made complying with plaintiff's obligation to have the same audited at least twice a year. This requirement or condition, or by whatever term it may properly be described, is interpreted into the bond from the statement made by Dye, president, in August 1906, prior to the execution of the bond, in answer to certain questions propounded by the defendant company. Among these questions, and those relied on are: "6. What will be the title of the applicant's position?" Answer: "Secretary & Treasurer." "Explain fully his duties in connection therewith." Answer: "The handling and accounting for the finance of the Company." "11. To whom and how frequently will he account for his handlings of funds and securities?" Answer: "Twice a year or more frequently if thought necessary." "12. What means will you use to ascertain whether his accounts are correct?" Answer: "Through the Auditing Committee as above stated." It is contended on behalf of the plaintiff that these statements and the subsequent statements on which the annual renewals of the bond were made are no part or parts of the bond, not being actually incorporated there-

in. This proposition is based on the provisions of section 15, chapter 34 of the Code, applicable to the contracts of fire, life and casualty insurance companies, inhibiting them from making any contracts therefor other than as plainly expressed in the policy issued or to be issued thereon. We do not think this statute is applicable to bonding companies like the defendant in. this case. Such companies are controlled and regulated by the provisions of chapter 54C of the Code, in which we find no provision limiting the form of the contract, such as that relating to insurance companies. Wherefore the forms of contracts of such bonding companies are controlled by the general law of contracts, and we think the parties to such contracts may refer to and make other papers parts thereof, as was done in this case. The cases of *Bowyer* v. *Continental Casualty Company*, 72 W. Va. 333, and *Bush* v. *Ohio & Indiana Live Stock Ins. Company*, 74 W. Va. 244, relied on by plaintiff's counsel, involve insurance contracts, not fidelity bonds, such as we are dealing with in this case, and of course section 15 of chapter 34 of the Code was· controlling in those cases.

But we need not deal further with this question. For, assuming the representations of the president of the plaintiff company to be parts of the bond, as the bond declares, was there any violation of the contract excusing liability of the defendant company growing out of the character of the audits of Hawkins' accounts during the continuance of the contract of indemnity? There is nothing in the representations of Dye, president, requiring that the insured should have its books or the accounts of Hawkins audited twice a year or oftener by expert accountants. The audit called for was to be done by an auditing committee, manifestly composed of members of plaintiff's board of directors. Directors are not presumed to be expert accountants; they are generally men of ordinary business capacity and intelligence, capable of engaging in the particular business undertaken; and it was an auditing committee composed of such persons that the contract plainly contemplated. The plaintiff company had such a committee composed of three of its directors, and the evidence shows that they did audit and go over the books and accounts of Hawkins oftener

than twice a year. They checked up the stock on hands and examined the accounts and cash on hand as such work is ordinarily done in business of the kind plaintiff was engaged in; and this we think satisfied the requirements of the contract. True, as argued by defendant's counsel, if the plaintiff had earlier employed expert accountants to go over and audit the accounts, Hawkins' defalcation might have been discovered earlier. But the evidence shows the directors had faith and confidence in him; he seemed to be efficient and frequently called upon the directors or auditing committee to count his cash, and to all outward appearances was intent on having his accounts scrutinized frequently. That he was able by false entries and forged checks and otherwise to cover up his pilferings is not to be counted against the plaintiff company. It must be assumed that it was such infidelity that it undertook by the bond of the defendant company to insure against, otherwise what necessity was there for such a bond? The courts of this country have spoken of the nature and obligation of contracts of this character. In *Southern Security Company* v. *Tyler & Simpson Company,* (Okla.), 120 Pac. 936, the obligee in a fidelity bond in a separate statement warranted that the books of its bookkeeper would be balanced monthly and the accounts balanced and looked after, and it was held that a monthly examination of the statements, reports and books by the officers of the insured which did not include a complete and thorough check or audit, satisfied the conditions of the bond, though a more careful audit would have disclosed the defalcation, and that the surety company was not released by the omission of the insured to make a more careful audit. In *First National Bank* v. *U. S. Fidelity & Guaranty Co.,* 150 Wis. 601, it was decided that mere neglect in respect to such examination by the officers or directors of the bank resulting in loss is not a defense to an action on the bond of a guaranty company unless such negligence amounted to fraud or bad faith. In *Hunter* v. *U. S. Fidelity & Guaranty Co.,* (Tenn.), 167 S. W. 692, the first point of the syllabus is: "A 'continuation certificate' made by the president of a bank to a guaranty company in contemplation of the renewal of a fidelity bond,

indemnifying it against losses due to the fraud or dishonesty of its cashier, certified that the books of the cashier 'were examined from time to time in the regular course of business and found correct in every respect, all moneys or property in his control or custody being accounted for with proper securities and funds on hand to balance his accounts, and he is not now in default.' *Held,* that the certificate was not a warranty of the correctness of such accounts, but merely that examinations were made as represented, and no errors or falsifications were discovered; the phrase 'and he is not now in default' not being a substantive and distinct warranty, independent of the preceding language, but only expressing the result of the examinations." If the close and relentless vigilance insisted upon by defendant was within the meaning of the contract, as was said in another case, the insured would have needed no insurance. The demands of the defendant would have made stealing on the part of Hawkins impossible. Such vigilance could not have been within the contemplation of the parties. *First National Bank* v. *Fidelity etc. Co.,* 100 Am. St. Rep. 765, note 787. The obligation of the directors of the plaintiff company imposed upon them by the contract was ordinary care in the audit of Hawkins' accounts, not such thorough examination as an expert accountant or skilled bookkeeper would have made. *U. S. Fid. & Guar. Co.* v. *Foster,* (Ky.), 156 S. W. 371. Due and customary diligence in supervision stipulated for in such contract, and no other, was required. *Guaranty Company of North America* v. *Mechanics Savings Bank,* 80 Fed. Rep. 767. The principles of these cases and others cited were recognized and applied by us in *Wait* v. *Homestead Building Asso.,* 76 W. Va. 431, 444. Referring to *Fidelity & Deposit Co.* v. *Courtney,* 186 U. S. 342, we said: "Likewise the Supreme Court of the United States denies any duty on the part of the employer to exercise diligence to ascertain whether the employee has defaulted or done any act indicative of untrustworthiness, to the end that the sureties may be protected, and repudiates the view that the doctrine of constructive notice applies to the subject." · Our conclusion is that the contract here involved, including the representations

of Dye, president, relied on, bind the plaintiff to no greater diligence in the auditing of books and accounts of Hawkins than would ordinarily be observed by directors in conducting the character of business plaintiff was engaged in; and there is not a particle of evidence in the record from which it could be inferred that they were grossly' negligent or acted fraudulently so as to relieve defendant from liability on the bond.

The third proposition urged by defendant to sustain the judgment is that the certificate signed on behalf of plaintiff in August 1916, by Dye, general manager, to the effect that the books and accounts of Hawkins, secretary-treasurer, had been examined by the plaintiff from time to time *in the regular course of business* and found correct in every respect, and that all moneys or property in his control or custody had been accounted for, with proper securities on hand to balance his accounts, and that he was not in default, and that he had performed his duties in a satisfactory manner, and that no change had occurred in the terms or conditions of his employment as specified in the bond, were false and known to said Dye to be false, as proper audit and inspection, if it had been made, would have shown. The evidence of Dye shows that he signed the certificate or certificates of renewal on the faith of the auditor's reports, and that he did not know that the facts stated were anything but true. He worked in an adjoining office to Hawkins every day, and had no knowledge of anything wrong in his accounts; he relied on the work of the auditing committee. What was meant by the certificate of Dye? Was anything more meant or implied than that the books and accounts as audited by the auditing committee *in the usual course of business* showed were correct and all matters accounted for? The certificate informed defendant that these books and accounts had been examined in the regular course of business, that is, as contemplated, by a committee of the board of directors, not by expert accountants or bookkeepers, and that everything thereby disclosed appeared regular and correct. And there is nothing in the evidence to show that these facts did not so appear therefrom. This, we think, was all that the condition of the bond or of the certificates of renewal issued by the defendant company

.called for, as we have shown in discussing the obligations and conditions of the original bond.

With respect to the other fact stated in said certificate, said to be false, namely, that no change in the terms or conditions of Hawkins' employment had occurred, we think the evidence shows this was substantially correct, so far at least as that fact affected the lability of the defendant company. It was literally true so far as authorized by any affirmative action of the board of directors or other officer was concerned. Reliance is placed on the fact that Hawkins was frequently suffered, that is not denied the right, to make trips away from town to visit customers and make collections, when he sometimes sold goods and turned in the orders to his company, which were filled and charged to the purchasers. The representation of plaintiff in the written statement referred to in the bond, describing the official position of Hawkins and his duties, was that the title of his present position was "secretary-treasurer," and that his duties in connection therewith were: "The handling and accounting for the finance of the company." If these duties required Hawkins to visit customers and make collections, as the evidence shows was his expressed opinion, there is nothing in the record to successfully contradict him, and how can we say that these methods of collection are not fairly within the scope of his employment? The rules enunciated in *Marshall* v. *Locomotive Engineers Mutual Life etc. Asso.,* 79 W. Va. 121, point 4 of the syllabus, and *Myers* v. *Mut. Life Ins. Co.,* 83 W. Va. 390, point 7 of the syllabus, cited and relied on by counsel for defendant, to the effect that an answer of an applicant for insurance to a particular question directed to him will be treated as a material representation, and if untrue avoid the policy, but this case does not fall within the protection of that rule. The question involved in the first case cited related to applicant's eyes. He was seeking insurance which would protect him against loss of sight. He made a false answer to the question whether his eyes had been affected by particular diseases or any other disease, and he answered, no. When as a matter of fact he had recently before been treated for diseases of the eyes by a physician. In the latter case the answers

elicited related to the health and habits of the applicant, and whether he had recently before the policy been treated for any disease &c. The court discusses the application of the rule involved here, to the answers made, and concludes as to all but one of them that the variance from the literal truth was so slight as not to amount to falsehood, including the one relating to whether he was in good health, and held that as he was in apparent good health, his answer to the question was substantially true. He appeared to be so, and so far as we know he was so, and there was no falsehood in his answer, even though he may in fact have been then afflicted with some malady unknown to him. What is the fact respecting the answers here involved? So far as the auditing of the books and accounts showed, the answers were literally true; this was all the contract called for. And in so far as they related to the changes in the duties or nature of Hawkins' employment, self imposed, they were so trivial in their effect upon the defendant company as not to amount to any substantial change. The taking of orders for goods by Hawkins were merely incidental to the making of collections, clearly within the duties of secretary-treasurer, described in the paper. Although the questions put and the answers elicited in applications for such contracts may be regarded material, no trivial or immaterial variation from the truth, according to these decisions, will be allowed to defeat the liability of the surety. In applying the rules and principles of the cases relied on, we must keep in mind the nature of the contract and obligation represented by a bond of indemnity like the one sued on in this case. When the answers and representations were made by Dye, they must be regarded as having been made, not as the facts might have been disclosed by an audit of experts, but as disclosed in the normal course of conducting the business and as the books and accounts on their face disclosed them, in the absence of gross negligence or fraud on the part of the officers or directors of the company.

The remaining proposition urged in defense of the judgment is that Dye's answer "No" to the question propounded in the written statement made a part of the bond, that plaintiff had never sustained any loss by anyone holding the same position

as Hawkins, was untrue; and reliance is had on the fact shown in evidence that prior thereto one Crooks occupying the same position with plaintiff had defaulted. But the question was whether plaintiff had ever sustained loss by one occupying that position, and the answer "no" was literally true, for Crooks adjusted the loss with the principal, and neither the defendant who was on his bond, nor the plaintiff sustained any loss therefrom. Moreover, the facts were all known to defendant or its representative at the time the bond involved here and all renewals thereof were executed. So this defense must also be denied.

In addition to the four several propositions mainly relied on by defendant's counsel, but not waived, now disposed of, they insist that plaintiff's recovery, notwithstanding the conditional verdict, must be limited to items of loss scheduled occurring subsequently to August 15, 1916, amounting to $4,616,19, with interest, instead of $10,000.00 with interest as found by the jury this upon the theory that each renewal of the bond sued on constituted a separate bond, and by the terms of which the loss sued for must have been discovered during the continuance of the bond or within six months from the expiration of the last renewal thereof. In the case at bar the last renewal before discovery was made June 1, 1917, to continue from August 15, 1917, to August 15, 1918. The first knowledge of the default came November 7, 1917, and it is conceded that the loss, if any, may extend to items occurring subsequently to August 15, 1916.

This doctrine of a separate and independent contract seems to have originated in the Kentucky case of *De Jernelte* v. *Fid. & Caus. Co.,* 17 Ky. Law. Rep. 1088, 33 S. W. 828, overruled or distinguished in *U. S. Fid. & Guar. Co.* v. *Shepherds' Home Lodge No. 2,* (Ky.), 174 S. W. 487. Before and since that decision most of the courts of this country have declined to follow the original Kentucky decision or the decisions of some of the New York courts announcing the doctrine of a separate contract. Among the decisions adhering to the rule of a continuing contract are: *First National Bank* v. *Fidelity & Guaranty Co.,* 100 Am. St. Rep. 765; *Rankin* v. *U.*

*S. Fid. & Guar. Co.,* (Ohio), 99 N. E. 314; *U. S. Fid. & Guar. Co.* v. *Citz. Nat. Bank of Monticello,* (Ky.), 143 S. W. 997; *Chatham Real Estate & Imp. Co.* v. *U. S. Fid. & Guar. Co.,* 90 S. E. 88; *First National Bank of Nashville* v. *U. S. Fid. & Guar. Co.,* 75 S. W. 1076; *Hunter* v. *U. S. Fid. & Guar. Co., supra; Pearson* v. *U. S. Fid. & Guar. Co.,* 164 N. W. 919. Our conclusion that the renewals thereof constituted a continuing contract, having its inception in the original bond, is strengthened by the notice of renewal sent plaintiff from time to time by defendant company, and the form of the certificate issued. The last one of these stipulates: "This continuation is executed upon the express condition that the company's liability under said bond and this and all continuances thereof shall not be cumulative and shall in no event exceed the sum of Ten Thousand ($10,000.00) Dollars.

The New York case, mainly relied on by defendant's counsel, is *Lowenfeld* v. *U. S. Fid. & Guar. Co.,* 223 N. Y. 608, from which they purport to quote at length, but we do not find the quotation, there or in the decision of the lower court, 180 App. Div. 927. According to this quotation the Court of Appeals undertook to distinquish that case from the prior cases of *Campbell Milk Co.* v. *U. S. Fid. & Guar. Co.,* 146 N. Y. Sup. 92, and *Hawley* v. *U. S. Fid. & Guar. Co.,* 100 App. Div. Sup. Ct. 12, in both of which the renewals were held to amount to continuation of the old contracts, not separate and independent contracts. This distinction thus instituted was mainly based on a change in the wording of the contract, namely, after reference to the dismissal of the employee, by adding the following: "within the period of this bond, whichever of these events shall first happen." We do not appreciate the effect of this change, as determined by the New York courts, if properly quoted. The manifest purpose of the provisions in these renewal contracts was to provide against cumulative liabilities and to limit the same to the penalties of the bonds. Mr. Joyce, in his work on Insurance, 3 Vol. (2nd ed.), sec. 1470a, p. 2662, adopts the rule of the cases adhering to the singleness of these fidelity obligations. Such is our conclu-

sion, and we must deny defendant's motion for a new trial based on the theory of excessiveness of the verdict.

The record shows that plaintiff also moved the court for a new trial, which was refused. In the petition one of the assignments of error is that the court erred in not giving to the jury plaintiff's instruction B, which would have told the jury to find a verdict for plaintiff for $13,592.62. In counsel's original brief it is argued on the motion for a new trial that plaintiff was entitled to judgment for at least $10,713.33, with interest from June 20, 1919, which is the date of the verdict. This is the exact sum found by the jury, which included principal and interest to date. Counsel does not show by reference to the evidence why the verdict is less than it should have been. He does not show how he arrived at the sum of $13,592.62 called for by his instruction B, rejected. According to the rule laid down in *Perry* v. *Horn,* 22 W. Va. 381, recovery in such cases is not limited to the penalty in the bond, but may include interest from the date of the breach. As counsel has not undertaken to show us from the record that the jury did not include in its verdict all of the interest to which plaintiff was entitled, we are not disposed to enter upon a critical survey of the evidence, to determine whether the verdict was wrong on this matter of interest.

Our judgment will be that the judgment below be reversed, the demurrer of defendant to plaintiff's evidence be overruled, and that plaintiff recover of the defendant The United States Fidelity & Guaranty Company, a corporation, the said sum of $10,713.33, as found by the verdict of the jury, with interest thereon from June 20, 1919, until paid, together with its costs in this court and in the circuit court in this behalf expended.

*Reversed; judgment for plaintiff.*